# United States Court of Appeals
## For the First Circuit

Nos. 10-1781, 11-1055

UNITED STATES OF AMERICA,

Appellee,

v.

DARRYL TAVARES, a/k/a Young Stallion, a/k/a Stallion,

Defendant, Appellant.

No. 10-2495

UNITED STATES OF AMERICA,

Appellee,

v.

EDDIE JONES, a/k/a Young Indian,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nancy Gertner, U.S. District Judge]

Before

Howard, Ripple,* and Lipez,
Circuit Judges.

---

* Of the Seventh Circuit, sitting by designation.

William A. Hahn for appellant Darryl Tavares and Robert R. Herrick for appellant Eddie Jones.

Randall E. Kromm, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

---

January 14, 2013

---

**RIPPLE, <u>Circuit Judge</u>.** After a jury trial, Darryl Tavares and Eddie Jones were both convicted under 18 U.S.C. § 371 of conspiracy to knowingly transport an individual in interstate commerce with the intent that such individual engage in prostitution, in violation of 18 U.S.C. § 2421 (Count One). Mr. Tavares was also convicted of knowingly transporting a minor, B.B., across state lines to engage in prostitution, in violation of 18 U.S.C. § 2423(a) (Count Nine), and of sex trafficking of a child, T.B., in violation of 18 U.S.C. § 1591 (Count Ten). Mr. Jones also was convicted of aiding and abetting the transportation of a minor, B.B., across state lines to engage in prostitution, in violation of 18 U.S.C. § 2423(a) (Count Nine), and of knowingly transporting a minor, K.S., in interstate commerce with the intent that she engage in prostitution, in violation of 18 U.S.C. § 2423(a) (Count Fourteen). The district court sentenced both Mr. Tavares and Mr. Jones to 300 months' imprisonment and to three years' supervised release. They have timely appealed their convictions and sentences on various grounds.[1] For the reasons set forth in this opinion, we affirm the judgments of the district court.

---

[1] The jurisdiction of this court was based on 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# I

## BACKGROUND

On May 16, 2007, a grand jury indicted Mr. Tavares, Mr. Jones and four other individuals for various offenses involving the transportation and trafficking of individuals for prostitution.[2] They were indicted for conspiring to knowingly transport individuals in interstate commerce with the intent that those individuals engage in prostitution. In addition, Mr. Tavares was charged with two counts of sex trafficking of children, and Mr. Jones was charged with one count of transporting a minor to engage in prostitution. The four other individuals pleaded guilty; Mr. Tavares and Mr. Jones chose to go to trial.

At trial, the Government established that Mr. Tavares and Mr. Jones were pimps who, over several years, prostituted young women, including high-school-age girls. The Government presented five principal witnesses, women who had worked as prostitutes for Mr. Tavares, Mr. Jones or both. Four of these five women worked for one or both defendants as prostitutes when they were under eighteen.

The Government's evidence demonstrated that Mr. Tavares and Mr. Jones worked closely together. The testimony recounted one incident in which Mr. Tavares and Mr. Jones, along with an

---

[2] The four co-defendants are Shaun Leoney, Reuben Porcher, Aaron Brooks and Trueheart Peeples.

associate, took a young girl from her home in Maine to become a prostitute in Boston, Massachusetts. Travel such as this was common; another woman testified that she had worked for Mr. Jones as a prostitute in several cities along the East Coast (Boston, Massachusetts, Atlantic City, New Jersey, Philadelphia, Pennsylvania and Washington, D.C.). The Government also presented evidence that Mr. Tavares and Mr. Jones had used violence and coercion against their victims. For instance, on one occasion, Mr. Tavares took a young woman to another pimp, assisted in assaulting her and then offered to take her back with him.

Mr. Tavares and Mr. Jones were sentenced separately. Mr. Tavares received an "organizer or leader" enhancement. The district court then imposed an above-guidelines sentence of 300 months' imprisonment, to be followed by three years' supervised release. The district court determined that Mr. Jones was a career offender and imposed a within-guidelines sentence of 300 months' imprisonment, to be followed by three years' supervised release.

# II

## DISCUSSION

Mr. Tavares and Mr. Jones were tried together, but sentenced separately. Their consolidated appeal contains only one common issue. Thus, for clarity and ease of discussion, we shall address first their joint trial on the merits, beginning with the

common issue and then turning to each defendant's claims. Finally, we shall discuss their respective sentencing claims.

## A.  Trial on the Merits

### 1.  The Common Issue:  Voir Dire

Mr. Tavares and Mr. Jones each have nicknames. Mr. Tavares's is "Stallion" or "Young Stallion"; Mr. Jones's is "Young Indian."  These nicknames were included on the docket sheet posted outside of the courtroom during jury selection.

Voir dire of the prospective jurors lasted three days. At the beginning of the proceeding, the district court informed the jurors of the nature of the charges.  The court then made some general inquiries to ascertain if any member of the venire had read or seen anything about the case or if any member was related to or knew the attorneys or witnesses.  The court then pointedly admonished the prospective jurors that they were "under an order not to talk about the case" and not to "guess what the case is about beyond what" the court had told them.[3]

The court then undertook an individual examination of each prospective juror.  Counsel were permitted an allotted time to question each prospective juror.  During that questioning, defense counsel often inquired about the jurors' views of pimps and prostitutes, and the relationship between the two. Defense counsel questioned some prospective jurors concerning their views about

---

[3]  R.292 at 23.

prostitutes who were minors. During this process, three prospective jurors reported that some members of the jury pool had discussed the district court's instructions about the case and the significance of Mr. Tavares's and Mr. Jones's nicknames in the jury room. They also said that there had been speculation about the nature of the case. They reported that several prospective jurors had laughed and joked about the nicknames, including one comment that the nicknames might indicate gang membership.

After listening to the jurors' accounts and considering the argument of counsel, the district court denied Mr. Tavares's motion to disqualify all jurors who had been in the jury room since the first report of discussion about the case and the nicknames. Mr. Tavares and Mr. Jones then asked to question prospective jurors who already had been preliminarily qualified. This request also was denied; the district court stated that it was not going to order the return of all preliminarily qualified jurors for additional questioning. It then explained that it was "fairly confident[] that all that was involved was speculation about what [the court's] instructions were and speculation about what [the defendants'] nicknames meant."[4] The court also noted that, in any event, the nicknames would be revealed at trial and that the early revelation of the nicknames "pales [in comparison] to what [defense

---

[4] R.294 at 75.

-7-

counsel] told the jurors" about the defendants' work as pimps.[5]

When subsequent prospective jurors were called for examination, the district court asked each potential juror whether he or she had discussed the case. One prospective juror, who admitted to joking about the nicknames, was challenged for cause and dismissed. After empaneling the jury, the court gave a general instruction to the jurors not to discuss the case with anyone, including each other, until all evidence was presented. However, no specific instruction was given about the nicknames or the earlier discussions.

Mr. Tavares and Mr. Jones submit that the district court's response to the discussion of the defendants' nicknames was inadequate. They maintain that the court committed reversible error when it refused to permit questioning of the entire jury pool. Alternatively, they contend that, upon learning of the discussion, the court should have dismissed the entire jury pool.

The parties variously cast the problem presented here as one of juror taint on the theory that prospective jurors were exposed to material outside the record, or of premature deliberation because prospective jurors speculated among themselves about the significance of facts that eventually would be before them, if they were selected for service on the chosen jury. Neither of these characterizations is a precise description of the

---

[5] <u>Id.</u> at 76.

-8-

rather unique situation that confronted the district court. In any event, choosing between these characterizations is not an essential part of the analytical task facing a district court, or this court, when dealing with juror misconduct. Our cases make clear that when faced with a non-frivolous allegation of any sort of juror misconduct, the district court must engage in a two-step analysis. See United States v. Diaz, 597 F.3d 56, 62-63 (1st Cir. 2010); United States v. Tejeda, 481 F.3d 44, 52 (1st Cir. 2007). First, the court must determine whether misconduct occurred. If no misconduct occurred, no further action is required. "[M]isconduct allegations that are frivolous . . . do not trigger any duty of inquiry and do not require that a hearing be held." United States v. Mikutowicz, 365 F.3d 65, 74 (1st Cir. 2004) (alterations in original) (internal quotation marks omitted). On the other hand, if any misconduct did occur, the court must proceed to "assess[] the magnitude and extent of any prejudice caused" and, if necessary, take remedial measures. Tejeda, 481 F.3d at 52. If no curative measures appear adequate, the court may grant a timely motion for mistrial. Id.

We review for abuse of discretion a district court's handling of juror misconduct. Diaz, 597 F.3d at 62.[6] The

---

[6] We cannot accept Mr. Tavares's contention that the standard of review is de novo under United States v. Jadlowe, 628 F.3d 1, 14 (1st Cir. 2010). Jadlowe involved review of the district court's instruction to the jury, not its response to potential juror misconduct. Id. at 15.

-9-

fact-specific and often delicate task of assessing such situations, which often requires the assessment of witness credibility, counsels that a district court must "enjoy broad discretion in addressing potential juror misconduct." Id. Therefore, "normally we will not reverse unless the judge's choice among the various avenues available was patently unreasonable." United States v. Lemmerer, 277 F.3d 579, 591 (1st Cir. 2002).

Here, our colleague in the district court followed the process of assessment prescribed by our case law. The court undertook an examination of the rather unique circumstances surrounding the incident. The court realized that the misconduct took place at a very early stage of the proceedings and also gave appropriate weight to the fact that the defendants' nicknames would indeed be before the yet-to-be selected jury as evidence during trial. Finally, the court determined that any harm caused by the discussion of the nicknames had been negated significantly by defense counsel's own statements to jurors about Mr. Tavares's and Mr. Jones's activities. Having made this assessment, the district court determined that admonishing the empaneled jury not to discuss the case or to form ultimate conclusions until all evidence had been presented was the appropriate course.

On the basis of our study of the trial transcript, we cannot accept the contention that the district court was obliged to conduct a more extensive inquiry. While not protracted, the

inquiry here was measured but sufficiently thorough. The court observed and evaluated firsthand the potential jurors' reports of the jury-room discussions. It took note of the conversations' content, the point in the proceeding when they took place and the fact that the matter discussed by the prospective jurors would be covered thoroughly at trial. The court then concluded that any harm from the violation of its initial instruction not to speculate about the trial could be cured by an appropriate cautionary instruction. This approach was certainly well within the options from which a thoughtful district court could be expected to choose, and we shall not second-guess the course taken by the court here.

## 2. Issues Raised by Mr. Tavares

Mr. Tavares raises several challenges to his convictions. We address these count by count.

### a. Conspiracy (Count One)

Count One of the indictment charged Mr. Tavares with conspiring to knowingly transport an individual in interstate commerce, intending that she engage in prostitution. In support, the indictment alleged twenty-six overt acts taken in furtherance of the conspiracy. Among these was Overt Act J, which alleged that "[i]n or about February 2004, after assisting in the assault of T.B. by covering her head with a garbage bag and securing it with duct tape, Darryl TAVARES negotiated with another male to have T.B.

-11-

return to work for him as a prostitute."[7]

T.B., a young woman who worked as a prostitute at various times for Mr. Tavares and for another pimp named "Jungle,"[8] was a witness at trial.  She testified about an incident when Mr. Tavares brought her to her then-pimp, Jungle.  She said Mr. Tavares was with Jungle when "they tied [her] hands behind [her] back with rope."[9]  She further testified that while Jungle put the bag over her head, he asked Mr. Tavares for help, but, because of the bag, she could not hear or see who participated in her subsequent beating.  After the assault, Mr. Tavares offered to take T.B. back, but Jungle refused because T.B. had to work for him first. Mr. Tavares's counsel extensively cross-examined T.B.

### i.  Admission of T.B.'s Testimony

Although Mr. Tavares does not appeal the admission of evidence concerning the other twenty-five overt acts, he does challenge the admission of T.B.'s testimony about Overt Act J.  He challenges T.B.'s testimony only as irrelevant under Rule 401 of the Federal Rules of Evidence and unfairly prejudicial under Rule 403.  We shall address these arguments in turn.[10]

---

[7]  R.1 at 3.

[8]  Jungle is an unindicted co-conspirator.

[9]  R.297 at 81.

[10]  At trial, Mr. Tavares grounded his objection to T.B.'s testimony in Federal Rules of Evidence 401, 403 and 404(b).  Before us, he has abandoned his Rule 404(b) objection.

-12-

We review the district court's admission of evidence for abuse of discretion. United States v. Upton, 559 F.3d 3, 15 (1st Cir. 2009). Under Federal Rule of Evidence 401, "evidence is relevant if it has any tendency to make a fact more probable or less probable than it would be without the evidence[] and the fact is of consequence in determining the action."

Mr. Tavares objected at trial, and presses here on appeal, that T.B.'s testimony was not relevant and is therefore inadmissible because it primarily inculpated Jungle.[11] The Government submitted at trial, and the district court agreed, that T.B.'s testimony was relevant because it explained the relationship between Mr. Tavares and T.B., a fact germane to whether Mr. Tavares transported T.B. for prostitution. Further, Mr. Tavares's offering to take T.B. off Jungle's hands suggests that she worked for him as a prostitute, also germane to whether Mr. Tavares trafficked her for sex (Count Ten). We certainly cannot discern any abuse of discretion in the district court's ruling. The events to which T.B. testified certainly have "a tendency to make a fact [that Mr. Tavares transported T.B. and trafficked her for sex] more probable than it would be without the evidence." Fed. R. Evid. 401. Furthermore, whether Mr. Tavares transported her and prostituted her "is of consequence in determining the action." Id.

Federal Rule of Evidence 403 provides that although

_____

[11] See, e.g., R.297 at 4-5.

-13-

relevant, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." We do not disturb the district court's balancing of probative value and risk of unfair prejudice absent "extraordinarily compelling circumstances." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988). We see no such extraordinary circumstances here.

In Mr. Tavares's view, even if T.B.'s testimony is relevant, it still should have been excluded because its probative value is substantially outweighed by the risk of unfair prejudice. According to Mr. Tavares, prostitution and sex trafficking of children are not violent crimes. Thus, he concludes, any mention of violence inherently poses a risk of prejudice substantially outweighing probative value and inviting jurors to decide the case purely on emotion. We accept neither Mr. Tavares's premise nor his conclusion. Violence, abuse and other forms of human degradation are part and parcel of sex trafficking. It is not at all surprising that evidence of such acts is offered to establish a conspiracy to engage in sex trafficking. Moreover, evidence of these violent acts was particularly probative of the defendants' relationship with the women because it directly demonstrated the control that the defendants exercised over the women in their prostitution operation. Specifically, with respect to Mr. Tavares, the evidence showed that the violent episode also entailed negotiations with Jungle to get T.B. back to work for him. The

testimony was also relevant to and probative of Mr. Tavares's knowledge and intent with respect to Count Ten, charging him with recruiting and transporting T.B. to engage in a commercial sex act.

Here, the district court considered Mr. Tavares's arguments several times and concluded that the probative value of T.B.'s testimony was not substantially outweighed by any risk of unfair prejudice. That decision was certainly among the options from which a reasonable judge could be expected to choose. The record contains no basis that would justify our overturning the district court's decision.

### ii. Prejudicial Variance

T.B.'s testimony concerning the incident with Jungle indisputably is at variance with the language of the indictment and the Government's identical proffer to the district court. The Government expected T.B. to testify that Mr. Tavares put the plastic bag over her head. However, T.B. testified that Jungle, not Mr. Tavares, put the bag over her head. Her testimony otherwise conformed to the indictment; she indicated that Mr. Tavares "assist[ed] in [her] assault" and "negotiated with another male [Jungle] to have T.B. return to work for him as a prostitute."[12]

"Not every variance calls for reversal." United States v. Seng Tan, 674 F.3d 103, 110 (1st Cir. 2012). Mr. Tavares must

---

[12]  R.1 at 3.

show that the variance prejudiced him.  Id.  Prejudice in this context is found when, for example, "the variance . . . le[ft the defendant] so in the dark about the charge against h[im] that []he could not prepare a defense or plead double jeopardy to stop a second prosecution for the same crime."  Id.

Here, Mr. Tavares faces an additional hurdle.  Because he did not object in the district court to this variance, our review is for plain error.  Id.  Thus, Mr. Tavares "must demonstrate that (1) an error occurred which was (2) clear or obvious and which not only (3) affected his substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings."  United States v. Savarese, 686 F.3d 1, 12 (1st Cir. 2012).

Mr. Tavares cannot establish any prejudice from the variance between the indictment's language and T.B.'s testimony at trial.  Mr. Tavares's conspiracy conviction did not depend on Overt Act J being proven.  Evidence was admitted concerning the twenty-five other overt acts charged in the indictment; the evidence supporting his (and Mr. Jones's) conviction was overwhelming.  Thus, any error in admitting T.B.'s testimony concerning Overt Act J was harmless.

The variance between the indictment and T.B.'s testimony was not prejudicial and affords no basis for reversal.

### b. Transportation of a Minor (Count Nine)

Mr. Tavares was convicted of knowingly transporting a minor, B.B., in violation of 18 U.S.C. § 2423(a). A great part of the evidence on this count came from B.B.'s own testimony. In evaluating the sufficiency of the evidence, we construe the evidence "in the light most favorable to the jury's verdict." United States v. Alfonzo-Reyes, 592 F.3d 280, 289 (1st Cir. 2010).

At trial, B.B. testified that, when she was seventeen, Mr. Tavares and Peeples, a co-defendant who pleaded guilty, picked her up at her high school in Maine. Mr. Tavares and Peeples then took her to her sister's home. Mr. Jones was at the home. The group talked about "[g]oing to Boston to make money."[13] Mr. Tavares, Mr. Jones and B.B. then drove from Maine to Massachusetts with some other people. B.B. testified that in the car she was told to pick her future pimp from among Mr. Tavares, Mr. Jones and another man; she chose Mr. Tavares.

During the ride, B.B. sat on Mr. Tavares's lap while he explained the rules of prostitution, including forbidding her from talking to other pimps and dictating how she should speak to him. She testified that she did not speak with Mr. Jones at her sister's apartment or on the drive to Boston. Immediately upon arrival in Boston, Mr. Tavares took B.B. to the streets to work as a prostitute. She worked there for a considerable period of time.

---

[13] R.295 at 40.

Mr. Tavares raises two challenges to his conviction for transporting B.B.: insufficient evidence and an erroneous jury instruction. He contends that the Government did not prove that he transported B.B. with the intent that she engage in prostitution and that the Government failed to prove that he knew B.B. was under eighteen at the relevant time. Mr. Tavares's assertion that the Government's proof of his knowledge of B.B.'s underage status was insufficient is closely linked to his challenge of the jury instruction on this count.

### i. Sufficient Evidence of Intent

In order to convict Mr. Tavares of transporting B.B., the Government was required to prove, among other things, that he had the "intent that [she] engage in prostitution." 18 U.S.C. § 2423(a). This element requires proof that "criminal sexual activity [was] one of the several motives or purposes . . . not a mere incident of the trip or trips, but instead was at least one of the defendant's motivations for taking the trip in the first place." United States v. Ellis, 935 F.2d 385, 390 (1st Cir. 1991) (alteration in original) (internal quotation marks omitted).

When reviewing the sufficiency of the evidence, we reverse only if "the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt." United States v. Paradis, 802 F.2d 553, 559 (1st Cir. 1986). We do not weigh

-18-

evidence or assess credibility.  See United States v. Downs-Moses, 329 F.3d 253, 261 (1st Cir. 2003).

Mr. Tavares maintains that the Government failed to prove beyond a reasonable doubt that he transported B.B. with the requisite intent.  According to Mr. Tavares, a jury could not draw a reasonable inference that he intended that B.B. engage in prostitution until they had arrived in Boston, i.e., after transportation was completed.  In support, he relies on the fact that only B.B.'s participation in an escort service, not prostitution, was discussed explicitly in Maine.

The record shows that the Government met its burden at trial.  The jury reasonably could infer from B.B.'s testimony that Mr. Tavares's purpose in bringing her from Maine to Boston was that she work for him as a prostitute.  The discussion about "[g]oing to Boston to make money" reasonably can be understood as relating to prostitution.  This interpretation is especially justifiable because Mr. Tavares is an admitted pimp, he picked B.B. up with another pimp (Peeples) and took her to discuss "mak[ing] money" with a third pimp (Mr. Jones).

Even disregarding this statement, Mr. Tavares's conduct during the ride from Maine to Boston clearly evidenced his intent in taking the trip.  En route from Maine to Boston, Mr. Tavares instructed B.B. to choose a pimp for whom to work and told her his rules for the prostitutes working for him.  Furthermore, the jury

was not limited to considering B.B.'s testimony in assessing Mr. Tavares's intent. For example, an FBI agent testified that Mr. Tavares told him that Peeples was B.B.'s sister's pimp but Peeples "couldn't handle both sisters and so they [Mr. Tavares and Peeples] had made arrangements . . . to bring [B.B.] down to the Boston area."[14]

Mr. Tavares's contention that no intent reasonably could be inferred from this evidence is unavailing. The evidence produced at trial was more than sufficient to prove beyond a reasonable doubt that Mr. Tavares had the requisite intent at least during, if not before, transportation.

### ii. Sufficient Evidence of "Knowingly"

Mr. Tavares also challenges the sufficiency of his conviction on Count Nine by contending that the Government failed to prove beyond a reasonable doubt that he knew B.B. was under eighteen at the time he transported her. This claim is linked closely to his contention that the district court erred in instructing the jury that it could convict him on this count[15] without finding that he knew B.B. was under eighteen. Therefore, we address the instructional issue first.

---

[14] R.299 at 78.

[15] Mr. Tavares also challenges the district court's instruction for Count Twelve, which involved the same offense with a different victim and an identical jury instruction. However, Mr. Tavares was acquitted of Count Twelve, and so we do not address this claim.

Title 18 of the United States Code, Section 2423(a) criminalizes "transportation with intent to engage in criminal sexual activity."  It provides that

> [a] person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

Id.  The district court instructed the jury that, in order to convict Mr. Tavares, it had to find that the Government proved beyond a reasonable doubt that (1) Mr. Tavares knowingly transported B.B. in interstate commerce, (2) with the intent that B.B. engage in prostitution and (3) B.B. was under eighteen years old at the time of the transportation.  The district court applied the "knowingly" requirement only to the act of transportation, not to the age of the individual transported.

We review de novo claims of legal error in jury instructions.  Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010).  Although we have not addressed whether § 2423(a) requires knowledge of the victim's underage status, all six circuits to

-21-

consider the issue have concluded that it does not.[16]

Mr. Tavares, relying on the Supreme Court's decision in Flores-Figueroa v. United States, 556 U.S. 646 (2009), urges that we break with our sister circuits and extend the knowledge requirement to the victim's underage status. In Flores-Figueroa, the Court construed 18 U.S.C. § 1028A(a)(1), which penalizes a person who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." The Court found that the statutory language required applying "knowing" to two elements: the "means of identification" and "of another person." Id. at 652-57. Mr. Tavares contends that Flores-Figueroa represents an emerging trend in the Supreme Court's jurisprudence of applying the scienter requirement to every statutory element. Thus, he concludes, this court should extend "knowingly" to the victim's underage status.

The Sixth and Seventh Circuits have considered and rejected this argument. See United States v. Daniels, 653 F.3d 399, 410 (6th Cir. 2011); United States v. Cox, 577 F.3d 833, 837-38 (7th Cir. 2009). These circuits agree that "the context of § 2423(a) compels a reading of the statute that does not require

---

[16] See, e.g., United States v. Daniels, 653 F.3d 399, 410 (6th Cir. 2011); United States v. Cox, 577 F.3d 833, 837-38 (7th Cir. 2009); United States v. Jones, 471 F.3d 535, 539 (4th Cir. 2006); United States v. Griffith, 284 F.3d 338, 350-51 (2d Cir. 2002); United States v. Taylor, 239 F.3d 994, 997 (9th Cir. 2001); United States v. Hamilton, 456 F.2d 171, 173 (3d Cir. 1972).

'knowingly' to be applied to the victim's age." Daniels, 653 F.3d

at 410. The court in Daniels held that this reading

> "is consistent with
> congressional intent that minors
> need special protection against
> sexual exploitation." We agree
> that this context justifies
> requiring a defendant--who would
> presumably know he is treading
> close to the line in
> transporting a young person to
> engage in illicit sexual
> activity--to bear the risk that
> the person transported is
> underage.

Id. (quoting Cox, 577 F.3d at 837). In addition to context, the

court noted that

> under the Mann Act, 18 U.S.C.
> § 2421, a defendant commits a
> crime any time he transports an
> individual for the purpose of
> prostitution. Therefore, age in
> § 2423(a) is not a factor that
> distinguishes criminal behavior
> from innocent conduct, but
> rather serves to justify a
> harsher penalty when a victim is
> underage. In contrast to the
> aggravated-identity-theft
> statute [at issue in Flores-
> Figueroa], when a defendant
> violates the Mann Act, he knows
> a real victim is involved, even
> if he does not know that victim
> is a minor.

Id. (citations omitted) (internal quotation marks omitted).

There is further reason to doubt that the Supreme Court

intended such a modification of existing case law interpreting

§ 2423(a). In Flores-Figueroa, Justice Alito, noting the

importance of context in legislative interpretation, suggested in a concurring opinion that the majority's principles of interpretation would not extend the scienter requirement in § 2423(a) to the underage status of the victim. 556 U.S. at 660 (Alito, J., concurring in part and concurring in the judgment).[17] As the Seventh Circuit noted in Cox, 577 F.3d at 838, the majority in Flores-Figueroa did not take explicit issue with Justice Alito's caution and, indeed, appeared to endorse it. See Flores-Figueroa, 556 U.S. at 652. For these reasons, we are persuaded by the reasoning of our sister circuits, and we see no need to depart from it.

Our construction of the term "knowingly" in the statutory language is fatal to Mr. Tavares's second sufficiency challenge and to his claim that the jury instruction was infirm. Even assuming, for the sake of argument, that the Government had not produced sufficient evidence of Mr. Tavares's knowledge of B.B.'s age, such a failure is irrelevant. The Government was under no obligation to prove that Mr. Tavares knew B.B. was underage.

---

[17] "In interpreting a criminal statute . . . it is fair to begin with a general presumption that the specified mens rea applies to all the elements of an offense, but it must be recognized that there are instances in which context may well rebut that presumption." Flores-Figueroa v. United States, 556 U.S. 646, 660 (2009) (Alito, J., concurring in part and concurring in the judgment). Justice Alito then specifically mentioned § 2423(a) as an example of such a situation and noted that "[t]he Courts of Appeals have uniformly held that a defendant need not know the victim's age to be guilty under this statute." Id.

### 3. Issues Raised by Mr. Jones

Mr. Jones challenges his convictions on Counts Nine and Fourteen. We address these challenges in turn.

#### a. Aiding and Abetting Transportation of a Minor (Count Nine)

Mr. Jones was convicted of aiding and abetting Mr. Tavares's transportation of B.B., in violation of 18 U.S.C. § 2423(a). He contends that the Government did not prove that he participated in Mr. Tavares's transportation of B.B. Rather, he maintains, the Government established that he was merely present while Mr. Tavares committed a crime.

To convict Mr. Jones of aiding and abetting, the Government was required to prove that he "participated in the illegal venture and sought by his actions to make it succeed." Downs-Moses, 329 F.3d at 261. "[P]roof of sufficient participation in the crime, as well as knowledge of it, is required to convict." United States v. Guerrero, 114 F.3d 332, 342 (1st Cir. 1997). Mere presence at the scene of the crime, even "with knowledge that a crime is being committed, is generally insufficient." United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982).

We conclude that the evidence produced at trial was sufficient to convict Mr. Jones of aiding and abetting the transportation of B.B. The Government established that Mr. Jones was a pimp and that he worked as one with Mr. Tavares. It also established that Mr. Jones was party to the discussion at B.B.'s

-25-

sister's home about "[g]oing to Boston to make money," which a jury reasonably could infer was a discussion about prostitution and one in which Mr. Jones participated. A jury could conclude that Mr. Jones's participation in such a discussion was part of an effort to recruit B.B. to be a prostitute, either for him or for Mr. Tavares. Given that the group left for Boston soon after, a jury further reasonably could infer that Mr. Jones accompanied them as part of the scheme to bring B.B. into the prostitution ring.

B.B. also testified that she was instructed on the ride to Boston to choose a pimp for whom to work from among the men in the car, including Mr. Jones. A jury could draw at least two reasonable inferences from this testimony, both supporting Mr. Jones's conviction. First, a jury reasonably could infer that Mr. Jones stood to benefit financially from transporting B.B. because there was a chance she would work for him. Second, it could infer that Mr. Tavares's indication of Mr. Jones as a potential pimp for B.B. demonstrates Mr. Jones's association with Mr. Tavares's plan to transport B.B. for prostitution. Indeed, had B.B. chosen differently, Mr. Jones could have been principally liable.

Mr. Jones stresses B.B.'s testimony that she did not speak to him either at her sister's home or during the car ride. This argument is unavailing. Considering B.B.'s testimony as a whole and Mr. Jones's working relationship with Mr. Tavares, such

lack of conversation between Mr. Jones and B.B. does not raise a reasonable doubt about Mr. Jones's aiding and abetting liability. Mr. Jones's presence at the discussion about making money in Boston and on the subsequent car ride permitted the jury to conclude that Mr. Jones had more than a coincidental association with Mr. Tavares's criminal venture and, indeed, had joined the illegal enterprise.

We therefore conclude that the evidence at trial was sufficient to justify Mr. Jones's conviction on Count Nine.

### b. Due Process and Voluntariness of K.S.'s Testimony (Count Fourteen)

Mr. Jones also was convicted of knowingly transporting a minor, K.S., in interstate commerce with the intent that she engage in prostitution, in violation of 18 U.S.C. § 2423(a). Mr. Jones alleges that K.S.'s testimony was coerced and that its admission into evidence violated his Fifth Amendment right to due process. He also claims, in the alternative, that the district court erred by failing to investigate sua sponte allegations of coercion.

K.S. was a Government witness. She testified that she met Mr. Jones when she was sixteen and began working for him as a prostitute. In this capacity, she worked for Mr. Jones in Boston and traveled with him on several occasions to work as a prostitute in other cities. In addition to Boston, Mr. Jones prostituted K.S. in Atlantic City, New Jersey, in Philadelphia, Pennsylvania and in Washington, D.C. After ending her relationship with Mr. Jones,

K.S. worked as a prostitute for Mr. Tavares.

On direct examination, K.S. admitted that she did not want to testify, but was doing so under a subpoena. Mr. Jones's counsel conducted a full cross-examination of K.S. During that cross-examination, she agreed with defense counsel that she had been threatened by FBI agents and a federal prosecutor with remaining in jail after she was arrested for failing to appear as required by a summons and with losing custody of her daughter if she did not "do what [they] wanted [her] to do."[18] She also agreed she was just going to tell the prosecution what they wanted to hear so she could move on with her life. On redirect, K.S. stated that she had been threatened by the FBI and federal prosecutors when she had been required to appear before the grand jury four years earlier and admitted that she had not told the district court that she had been threatened.

Mr. Jones did not object to K.S.'s testimony at trial. Accordingly, we review his challenges to K.S.'s testimony for plain error. United States v. Matos-Quiñones, 456 F.3d 14, 20-21 (1st Cir. 2006).

Mr. Jones's claim is very similar to the one we rejected in United States v. Hall, 434 F.3d 42 (1st Cir. 2006), and that case provides substantial guidance. According to the testimony in that case, agents told one witness that she faced prosecution if

---

[18] R.296 at 32.

-28-

she did not tell them "what they wanted to hear." Id. at 57 (internal quotation marks omitted). Another witness testified that an agent told him that if he did not cooperate, the Government would take his home. In light of this testimony, the defendant in Hall contended that the Government had violated his Fifth and Sixth Amendment rights by "threatening certain witnesses with severe consequences if they did not testify on the government's behalf." Id. In assessing this claim, we noted that a due process violation can occur when witnesses are discouraged from testifying through threats or other coercion. Notably, we distinguished those cases from situations where "the government has to press unwilling witnesses . . . to provide testimony that they are reluctant to give." Id. at 57-58. Therefore, unlike Government efforts to prevent the testimony of certain witnesses, "[t]here is no blanket rule against inducements by the government to witnesses to produce truthful testimony." Id. at 58. While making this distinction, we nevertheless recognized the possibility that, "in extreme circumstances, government misconduct[] could occur through improper efforts to shape testimony to the government's liking." Id. However, we determined that Hall presented no such circumstances, and, in any event, no constitutional violation had occurred because "there was conflicting testimony as to whether the government actually threatened [the witnesses] and defense counsel was allowed to cross-examine on the issue, leaving it to the jury to evaluate

witness credibility in light of the evidence concerning the alleged threats."   Id.

Upon examination of the circumstances here, we must reach the same conclusion as the one that we reached in Hall:  There is no constitutional violation.  To be sure, K.S. did not want to testify against Mr. Jones.  Indeed, she threw away a summons to appear before the grand jury and subsequently failed to appear as required.[19]  She testified at trial only because she had been subpoenaed,[20] and she stated several times that she did not want to testify against Mr. Jones.[21] What Mr. Jones's counsel characterized as the Government's "threats," are more accurately viewed as lawful coercion of a reluctant witness to testify as required by law.  Such "threats" are the legal consequences for failing to appear pursuant to a summons.  Additionally, as in Hall, Mr. Jones's counsel fully cross-examined K.S. on this issue.  There was ample testimony in the record to permit the jury to evaluate K.S.'s credibility in light of all these circumstances.

Nor can we say, as suggested by Mr. Jones, that the district court committed plain error in not conducting an evidentiary hearing prior to admitting the testimony.  Mr. Jones contends that these "threats" trigger the analysis set forth in

---

[19]   R.296 at 34.

[20]   R.295 at 104.

[21]   See, e.g., R.296 at 23-24, 27.

-30-

LaFrance v. Bohlinger, 499 F.2d 29, 35 (1st Cir. 1974). In that case, we determined that the circumstances surrounding a witness's statement were so indicative of its involuntariness as to require a hearing. Specifically, a witness had recanted a prior sworn statement while testifying; he claimed that the prior statement was a police fabrication that he had been forced to sign while under the influence of drugs. Id. at 31. There, we stated that "[i]t is unthinkable that a statement obtained by torture or by other conduct belonging only in a police state should be admitted at the government's behest in order to bolster its case." Id. at 34. Because the surrounding circumstances raised a substantial claim that the statement was legally involuntary, see Lego v. Twomey, 404 U.S. 477, 480 (1972); Jackson v. Denno, 378 U.S. 368, 372 (1964), we held that the trial court had an obligation to investigate, through an evidentiary hearing, whether the testimony was voluntary. LaFrance, 499 F.3d at 35.

There is a material and qualitative distinction between the prosecutorial misconduct at issue in LaFrance and the situation before us today. LaFrance dealt with police extraction of a statement from a drug-impaired witness, by means which we described as "police threats and other blatant forms of physical and mental duress." Id. In her testimony, K.S. related on cross-examination instances of lawful pressure. She was apprised of the lawful consequences of her failing to testify, which she was legally

-31-

required to do. The purpose of informing her of those legal consequences, moreover, was to ensure that she fulfilled her obligation to testify, not to ensure that she give particular testimony.

Given the nature of the Government's pressure and the full picture of the surrounding circumstances rendered by the robust cross-examination to which K.S. was subject, we conclude that the district court had no duty to inquire further into the voluntariness of K.S.'s testimony. There was no error, and certainly no plain error, in the district court's admission of this testimony.

## B. Sentencing

### 1. Mr. Tavares's Sentencing

Mr. Tavares's presentence report ("PSR") calculated that he had a total of fourteen criminal history points, which corresponds to a criminal history category of VI. The PSR noted that Mr. Tavares had one three-point state criminal conviction and eight one-point offenses, including two juvenile adjudications. Because the United States Sentencing Guidelines section 4A1.1(c) provides that a maximum of four one-point prior offenses can be included in a criminal history points calculation, the PSR assigned only four points for these convictions.

At sentencing the district court heard arguments from the Government and from Mr. Tavares concerning the PSR's criminal

history category calculation, the imposition of several sentence enhancements and the 18 U.S.C. § 3553(a) factors. The Government submitted that Mr. Tavares's criminal history category was VI; Mr. Tavares maintained that the appropriate criminal history category was V. The district court never determined which criminal history category was correct.

The district court imposed "organizer or leader" and obstruction of justice enhancements for one of Mr. Tavares's conduct groups (Group 3). Given these enhancements and their differing views on the appropriate criminal history category, the Government and Mr. Tavares disagreed on the correct guidelines sentencing range. The Government's guidelines sentencing range calculation was 235 to 293 months. Mr. Tavares's guidelines sentencing range calculation was 210 to 262 months. The Government asked that the district court impose a sentence of 300 months' imprisonment, a sentence in excess of the Government's own calculated guidelines sentencing range.

The district court never chose between the Government's proposed guidelines sentencing range and Mr. Tavares's. During argument on sentencing enhancements, the court stated: "[E]ssentially I will sentence in a way that it will make [the guidelines sentencing range calculation] not matter."[22] After considering both potential ranges, the district court decided that

---

[22] R.308 at 17.

it would impose a sentence above either range and so it was unnecessary to decide between the two. The court ultimately imposed a sentence of 300 months' imprisonment on Mr. Tavares.

The court explained that it imposed this sentence for several reasons. First, it viewed Mr. Tavares's crime as "a crime of intentionality," "a lifestyle crime," "a choice . . . Mr. Tavares made."[23] Second, the court reasoned that "this is a crime that can be deterred because it's the lifestyle choice, and if the cost of this lifestyle is 30 years in prison, then it seems . . . that others will pause."[24] The court also stated that the testimony of Mr. Tavares's victims concerning the violence to which he subjected them during the crimes of conviction was "about the most disturbing testimony that [it had] heard."[25] Thus, it reasoned, "a 300-month sentence serves all the purposes of sentencing but notably and candidly retribution, retribution for the women who were victimized, retribution for the violence they suffered."[26] The court concluded that its chosen sentence "fully satisfie[d] the purposes of sentencing, particularly general deterrence, specific deterrence, retribution, public safety, indeed

---

[23] Id. at 43.

[24] Id.

[25] Id.

[26] Id. at 44.

incapacitation."[27]

"We review the district court's interpretation and application of the sentencing guidelines <u>de novo</u> and factual findings for clear error." <u>United States</u> v. <u>Cortés-Cabán</u>, 691 F.3d 1, 26 (1st Cir. 2012). "We review the reasonableness of a criminal sentence under an abuse-of-discretion standard." <u>United States</u> v. <u>Rivera-Moreno</u>, 613 F.3d 1, 8 (1st Cir. 2010) (citing <u>Gall</u> v. <u>United States</u>, 552 U.S. 38, 51 (2007)). Review of a sentence under this standard generally involves a two-step process: First, we determine whether the district court committed procedural error; second, if there was no procedural error, we determine whether the sentence was substantively reasonable. <u>See</u> <u>Gall</u>, 552 U.S. at 51. We review for plain error Mr. Tavares's claims that he raises for the first time on appeal. <u>See</u> <u>United States</u> v. <u>Ríos-Hernández</u>, 645 F.3d 456, 462 (1st Cir. 2011).

### a. Calculation of Mr. Tavares's Guidelines Sentencing Range

Mr. Tavares correctly points out that the district court never conclusively determined his guidelines sentencing range. It considered both the Government's calculation and Mr. Tavares's, but never determined which was correct or stated upon which it relied. This lapse is clearly a significant procedural error. The district court is required to calculate the defendant's guidelines

---

[27] <u>Id.</u> at 47.

sentencing range before exercising its discretion.  See Gall, 552 U.S. at 49 (stating that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range") (citing Rita v. United States, 551 U.S. 338, 347-48 (2007)).  "[F]ailing to calculate (or improperly calculating) the Guidelines range" is a "significant procedural error."  Gall, 552 U.S. at 51.  The Supreme Court has made clear that "[t]he Guidelines provide a framework or starting point . . . for the judge's exercise of discretion."  Freeman v. United States, 131 S. Ct. 2685, 2692 (2011).

Under the particular circumstances of this case, however, we are convinced that the district court's failure to calculate definitively the operative guidelines sentencing range was harmless.  The record disclosed that the district court understood the position of the parties on the applicable guidelines range.  It is also apparent that the court understood that the only point of disagreement between the parties was the applicable criminal history category.  There is, moreover, no basis to conclude, and neither party suggests, that the proper guidelines sentencing range was other than one of those suggested and discussed at the sentencing hearing.  The court imposed sentencing enhancements, the sole purpose of which is to alter a defendant's guidelines sentencing range, and considered both resulting guidelines

sentencing ranges.[28]  The record makes equally clear, however, that, having been apprised of these considerations, the district court determined that a sentence within the guidelines range as calculated by either party was not an appropriate sentence.  The court stated:  "[E]ssentially I will sentence in a way that it will make [the guideline sentencing range calculation] not matter."[29]  Therefore, regardless of whether Mr. Tavares's guidelines sentencing range was that calculated by the Government or by Mr. Tavares, the district court was of the view that a sentence of 300 months was warranted.

Although the district court's failure to calculate conclusively Mr. Tavares's guideline sentencing range is a serious procedural error, such an error does not necessarily require remand for re-sentencing.  The Supreme Court held in Williams v. United States that "remand is required only if the sentence was imposed as a result of" the error.[30]  503 U.S. 193, 202-03 (1992) (internal quotation marks omitted).  If "the district court would have imposed the same sentence" even without the error, it was harmless.

---

[28]  R.308 at 5-25.

[29]  Id. at 17.

[30]  In United States v. Williams, 503 U.S. 193 (1992), the Court was interpreting 18 U.S.C. § 3742(f)(1), which provides, in relevant part, "[i]f the court of appeals determines that the sentence was . . . imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings."  Section 3742(f)(1) was not changed by United States v. Booker, 543 U.S. 220 (2005).

Id.  We routinely apply Williams's harmless-error analysis to procedural errors at sentencing.[31]  Whether the district court's commission of a significant procedural error, here its failure to calculate Mr. Tavares's guidelines sentencing range, is subject to harmless-error analysis under Williams is a question of first impression in this circuit.  Our colleagues in the Sixth Circuit have confronted squarely the issue of whether Williams applies to a failure to calculate definitively the guidelines sentencing range and have held that it does.  See, e.g., United States v. Lanesky, 494 F.3d 558, 561-62 (6th Cir. 2007) (performing harmless-error analysis where "the sentencing court did not calculate an applicable guideline range at all").[32]  Other circuits, while not confronting precisely this issue, have held that other serious procedural sentencing lapses are subject to Williams and to

_____

[31]  See, e.g., United States v. McGhee, 651 F.3d 153, 158 (1st Cir. 2011) (performing harmless-error analysis on the district court's erroneous application of a career offender designation); United States v. Marsh, 561 F.3d 81, 86 (1st Cir. 2009) (applying harmless-error analysis to the district court's application of an upward departure under U.S.S.G. § 5K2.0).

[32]  The Third and Ninth Circuits also have addressed this issue in unpublished opinions and reached the same conclusion.  See, e.g., United States v. Swanson, 455 F.App'x 246, 249 (3d Cir. 2011) (holding that "the District Court's failure to calculate explicitly the Guidelines range . . . was harmless error"); United States v. Olibas-Valenzuela, 404 F.App'x 213, 214 (9th Cir. 2010) (applying harmless-error analysis where the district court "did not calculate the advisory Guidelines range[] and neither the parties nor the probation office identified the applicable range").

harmless-error analysis.[33]

The reasoning of our sister circuits is persuasive. The fact that Gall designated failure to calculate the guidelines sentencing range as serious procedural error does not preclude application of Williams's harmless-error analysis. As our colleagues on the Eighth Circuit have concluded, "[w]e see nothing in Gall that undermines Williams or makes harmless-error analysis inapplicable to procedural sentencing errors." United States v. Henson, 550 F.3d 739, 741 (8th Cir. 2008). We note, furthermore, that the Supreme Court in United States v. Booker, 543 U.S. 220 (2005), noted the continued validity of harmless-error analysis in

---

[33] See, e.g., United States v. Woods, 670 F.3d 883, 886 (8th Cir. 2012) ("A failure to properly calculate the advisory Guidelines range is a significant procedural error, and a non-harmless error in calculating the guidelines range requires a remand for resentencing." (quoting United States v. Spikes, 543 F.3d 1021, 1023 (8th Cir. 2008))); United States v. Bacon, 617 F.3d 452, 456-57 (6th Cir. 2010) (applying harmless-error analysis where "the district court . . . committed a significant procedural error"); United States v. Lynn, 592 F.3d 572, 576 (4th Cir. 2010) (same); United States v. Delgado-Martinez, 564 F.3d 750, 752-53 (5th Cir. 2009) (same); United States v. Abbas, 560 F.3d 660, 666 (7th Cir. 2009) (applying Williams's harmless-error analysis to "a mistake that is specifically listed as a significant procedural error in Gall [v. United States, 552 U.S. 38 (2007)]"); United States v. Livesay, 525 F.3d 1081, 1092 (11th Cir. 2008) (applying harmless-error analysis where "the district court committed prong one or 'procedural' Gall error when it departed 18 levels under § 5K1.1"); United States v. Grissom, 525 F.3d 691, 696 (9th Cir. 2008) (holding that remand is necessary only "if the sentence imposed resulted from an incorrect application of the Sentencing Guidelines, and the error was not harmless" (emphasis added) (internal quotation marks omitted)); United States v. Kristl, 437 F.3d 1050, 1054-55 (10th Cir. 2006) (holding that the court "must remand--without reaching the question of reasonableness--unless the error is harmless").

procedural error cases. The Court stated that "in cases not involving a [constitutional] violation, whether resentencing is warranted or whether it will instead be sufficient to review a sentence for reasonableness may depend upon application of the harmless-error doctrine." Id. at 268.

An error is harmless if it "did not affect the district court's selection of the sentence imposed." Williams, 503 U.S. at 203. However, even if we are satisfied that an error did not affect the district court's determination of the sentence, we still must review the sentence for substantive reasonableness. See id. ("If the party defending the sentence persuades the court of appeals that the district court would have imposed the same sentence absent the erroneous factor, then a remand is not required . . . and the court of appeals may affirm the sentence as long as it is also satisfied that the departure is reasonable."); United States v. Marsh, 561 F.3d 81, 86 (1st Cir. 2009) (reviewing the district court's discussion of § 3553(a) factors after determining that any error in the district court's sentencing was harmless).

With these principles in mind, we first consider whether the district court's error was harmless. As we noted earlier, the district court clearly stated that it would sentence Mr. Tavares in such a manner as to render the guidelines sentencing range irrelevant. It also engaged in a lengthy colloquy with the parties concerning various enhancements to Mr. Tavares's sentence.

Ultimately, the district court calculated Mr. Tavares's guidelines sentencing range assuming a criminal history category of V and then assuming a criminal history category of VI.  Immediately before sentencing Mr. Tavares, the court stated, "I just want to identify again the Sentencing Guideline range which was[,] even accepting the defense's calculations, the guideline range is 210 to 262 months.  I've described why, taking the government's calculations . . . it's still 235 to 293 at a category 6."[34]  With both of these potential guidelines sentencing ranges in mind, the court then stated, "I am going to accept the government's recommendation here, and here's why:  This is a crime of intentionality.  This is a lifestyle crime.  This is a choice . . . Mr. Tavares made."[35]

This is just the type of harmless error in sentencing envisioned in United States v. Rodriguez, 630 F.3d 39 (1st Cir. 2010).  In Rodriguez, we stated:

> Certainly there are situations in which a judge might make clear that a dispute about a Guidelines calculation did not matter to the sentence. This might be a different case if, for example, the district judge had been faced with an explicit choice between the two sets of Guidelines, and thus understood the magnitude of the difference between them, when he said the choice did not affect

---

[34]  R.308 at 42.

[35]  Id. at 43.

the sentence.

Id. at 43. Disagreement over Mr. Tavares's criminal history category separates Mr. Tavares's calculation from the Government's. The district court understood this disagreement and chose not to decide between the two proposed guidelines sentencing ranges because the severity and nature of Mr. Tavares's crimes of conviction made doing so unnecessary. Indeed, in its statement of reasons, the district court wrote that "Criminal History Category is V or VI."[36] The district court therefore did not fail completely to calculate Mr. Tavares's guidelines sentencing range or impose his sentence without any consideration of the Guidelines. Rather, it determined that whether Mr. Tavares's criminal history category was V or VI did not impact its sentencing decision. The district court clearly understood the options within the possible guidelines calculations and clearly rejected all of them as yielding too lenient a sentence. The district court's evident intent to sentence Mr. Tavares to 300 months' imprisonment regardless of whether his criminal history category was V or VI is sufficient to demonstrate that the district court's failure to determine Mr. Tavares's guidelines sentencing range did not affect the sentence it imposed.

This situation is not materially different from situations that we and our sister circuits have encountered with

---

[36] R.283 at 7.

respect to other procedural errors. For example, in Marsh, the district court stated "that it would impose the same sentence as a non-guideline sentence under 18 U.S.C. § 3553(a)." 561 F.3d at 85. We held that the defendant's claim of procedural error "is not one we need to resolve" because "the district court stated that it would have imposed the same sentence as a non-Guideline sentence." Id. at 86. This statement was sufficient for us to conclude that "an alleged Guideline error would not have affected the district court's sentence." Id.; see also United States v. Ortiz, 636 F.3d 389, 395 (8th Cir. 2011) (holding that "[b]ecause the district court stated that 'even in the absence of these departures under the Sentencing Guidelines, [the district court] would [have] impose[d] the same sentence,' any procedural error was harmless as a matter of law" (alterations in original)); United States v. Teague, 469 F.3d 205, 209-10 (1st Cir. 2006) (holding that the district court's erroneous determination that the defendant was a career offender under the Guidelines was harmless because the district court stated that it found the career offender enhancement "undue or excessive" and so did not rely on the enhancement in sentencing).[37]

---

[37] This case stands in stark contrast to typical cases where a district court's failure to calculate a defendant's guidelines sentencing range has warranted a remand for resentencing. Cases in which reversible error has been found involve far less awareness of the applicable guidelines range than we find here. In United States v. Peebles, 624 F.3d 344, 347 (6th Cir. 2010), the Sixth Circuit remanded the case for resentencing because "the transcript

-43-

We therefore conclude that the district court's failure to choose between the two proposed guidelines sentencing ranges and determine definitively which applied is harmless error. We must therefore review the substantive reasonableness of Mr. Tavares's sentence. See infra II.B.1.f.

### b. Since-Vacated State Conviction

During the pendency of this appeal, Mr. Tavares's Massachusetts criminal conviction, which was given a score of three in the PSR, was reversed and its verdict set aside. See Commonwealth v. Tavares, 959 N.E.2d 449, 451-52 (Mass. App. Ct. 2011). According to the PSR, Mr. Tavares's criminal history category was VI; had this conviction not been counted, it would have been V. He contends that the inclusion of this since-vacated state conviction in his guidelines sentencing range calculation requires resentencing.

As we have noted earlier, Mr. Tavares's sentence was not imposed as a result of his guidelines sentencing range calculation; his criminal history category did not affect the district court's

---

of the sentencing hearing does not reflect that the district court addressed the Guidelines range at all." "The applicable Guidelines range was not discussed during the hearing by either attorney or by the judge," so the court found it "impossible to determine with certainty what sentencing range the district court relied on, and whether the district court meant to impose a sentence within or above that range." Id.; see also United States v. Novales, 589 F.3d 310, 314 (6th Cir. 2009) (remanding for resentencing where "the district court never mentioned any specific, numeric Guidelines range at any point during the [sentencing] hearing").

-44-

sentencing.  Because failing to determine Mr. Tavares's guidelines sentencing range is harmless error, any error in calculating the guidelines sentencing range, such as improperly including a prior conviction, is harmless.

We have recognized that, in some cases, an erroneous calculation or designation "can be influential even if not treated as controlling."  United States v. McGhee, 651 F.3d 153, 159 (1st Cir. 2011).  In McGhee, the district court had classified the defendant as a career offender under the Guidelines but the case on which it relied to do so subsequently was overruled.  We therefore were required to "treat that [designation] retrospectively as error."  Id. at 158.  Moreover, in explaining the defendant's sentence, the district court made ambiguous remarks concerning its rationale for the sentence's length.  As a result, we held that "we think the transcript is less clear than it was in Teague that the career offender designation was entirely irrelevant."  Id. at 159. In Teague, we concluded that the district court had made clear that its erroneous designation of the defendant as a career offender had not mattered to its sentencing--only the circumstances of prior crimes and the defendant's role in the crime of conviction had been considered.  469 F.3d at 209.  Therefore no remand was required. Id. at 209-10.

This case is not like McGhee.  We do not believe that the record supports the view that the district court was influenced

materially by the inclusion of Mr. Tavares's since-vacated conviction in his PSR. On the contrary, the record indicates that the district court considered only Mr. Tavares's crimes of conviction in imposing his sentence, not his since-vacated conviction. After initially stating its chosen sentence, the district court explained its rationale:

> I believe that this is a crime that can be deterred because it's the lifestyle choice, and if the cost of this lifestyle is 30 years in prison, then it seems to me that others will pause.
>
> I'm going to accept the government's recommendation because I sat through the testimony of women that was about the most disturbing testimony that I've heard since I've been on the bench.[38]

The court repeatedly connected trial testimony[39] and Mr. Tavares's victims[40] in his crimes of conviction to his sentence of 300 months. Mr. Tavares's since-vacated conviction was not mentioned by the district court and there is no evidence in the record that the district court was in any way relying on, or influenced by, this conviction or the PSR's guidelines sentencing range calculation which included it. As we have noted earlier, the district court

---

[38] R.308 at 43.

[39] Id.

[40] Id. at 45.

-46-

did not view Mr. Tavares's criminal history as operative in the determination of the sentence. It made clear that it would have imposed the same sentence had Mr. Tavares's criminal history category been V; its focus was the nature and the circumstances of the crimes of conviction. See Teague, 469 F.3d at 209-10 (affirming the defendant's sentence where the district court erroneously believed that the defendant was a career offender under the Guidelines and then used its discretion to depart downward from the guidelines sentencing range after considering the defendant's role in the crime of conviction).

We therefore conclude that the inclusion of Mr. Tavares's since-vacated conviction in his PSR was harmless error.

### c. "Organizer or Leader" Enhancement

The district court imposed a two-level "organizer or leader" enhancement on Mr. Tavares's sentence under United States Sentencing Guidelines section 3B1.1(c). Evidence produced at trial established that Mr. Tavares had a prostitute collect money from his other prostitutes, drive around his other prostitutes and inform him when a prostitute had misbehaved. The district court found that "Mr. Tavares was the top of this organization,"[41] stating that "[t]here's no question that he was in a leadership role" in committing the offenses of conviction.[42]

---

[41] R.308 at 16.

[42] Id. at 15.

United States Sentencing Guidelines section 3B1.1(c) provides for a two-level enhancement if the defendant "was an organizer, leader, manager, or supervisor in any criminal activity other than" a criminal activity involving five or more participants. Under this provision, therefore, the defendant must exercise leadership over fewer than five participants. A "'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. 1.

Mr. Tavares contends that the prostitutes he employed cannot be "participants" within the meaning of section 3B1.1(c) because they received immunity from prosecution. Their immunity, he argues, prevents them from being criminally responsible for the offenses of conviction. We cannot accept this argument. The Guidelines' commentary notes that a "participant" need not be convicted of the offense. That a participant can be unindicted is clear from the plain language of the Guideline. See, e.g., United States v. Scott, 529 F.3d 1290, 1303 (10th Cir. 2008) ("A 'participant,' in turn, must be 'criminally responsible for the commission of the offense' even if he or she was not charged or convicted." (quoting U.S.S.G. § 3B1.1 cmt. n.1)); United States v. Messervey, 317 F.3d 457, 464-65 (5th Cir. 2002) (rejecting defendant's assertion that "the district court erred when it found that those [the defendant] exploited to his advantage in his fraud

-48-

schemes were 'participants' in the offenses . . . because the PSR described these people as 'victims'"); see also U.S.S.G. § 3B1.1 introductory cmt. ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 . . . and not solely on the basis of elements and acts cited in the count of conviction.").

We have not had occasion to consider whether a grant of immunity precludes designation as a "participant." The only appellate court to have addressed the issue has concluded that a grant of immunity does not preclude such a designation. See United States v. Anderson, 580 F.3d 639, 650 n.16 (7th Cir. 2009); United States v. Jackson, 95 F.3d 500, 511 (7th Cir. 1996). In light of our sister circuit's reasoning and the clear language of the Guideline, we also hold that a "participant" can be an immunized witness against the defendant. The district court did not err in imposing an "organizer or leader" enhancement.

### d. Juvenile Adjudications

Mr. Tavares also challenges the inclusion of two juvenile adjudications in his PSR, each scored as one point under United States Sentencing Guidelines section 4A1.2(d)(2)(B). He raises two issues on appeal, neither of which he raised in the district court. Thus, our review is for plain error.

First, Mr. Tavares contends that the Government failed to meet its burden of showing that his juvenile offenses were punished

by at least sixty days' confinement. Mr. Tavares misapprehends the legal standards governing the inclusion of his juvenile adjudications in the PSR. The PSR scored each adjudication under section 4A1.2(d)(2)(B). Under this section, the Government only need establish that the relevant "juvenile sentence [was] imposed within five years of the defendant's commencement of the instant offense"; it does not have to establish any length of confinement. Mr. Tavares erroneously cites the standard required to score an adjudication as two points, see U.S.S.G. § 4A1.2(d)(2)(A), which the PSR did not do. Because Mr. Tavares alleges that the Government failed to meet the requirements of a standard it did not apply, his argument fails.

Second, Mr. Tavares urges us to reject the consideration of juvenile adjudications in sentencing on policy grounds. Mr. Tavares notes that his "main contention" is "that since the sentencing guidelines are now advisory rather than mandatory . . . it is open to him to argue that countervailing policies counsel against use of juvenile adjudications in federal sentencing."[43] "The Guidelines specifically provide for certain juvenile adjudications to be considered in evaluating the defendant's criminal history." United States v. Gonzalez-Arimont, 268 F.3d 8, 14 (1st Cir. 2001) (citing U.S.S.G. § 4A1.2(d)). We consistently

---

[43] Appellant Tavares's Br. 60.

-50-

have upheld scoring juvenile adjudications under the Guidelines.[44] Certainly, there is no plain error in considering Mr. Tavares's juvenile adjudications. In any event, as we have noted earlier, Mr. Tavares's sentence would have been the same even if the juvenile convictions had not been considered. Moreover, Mr. Tavares has eight prior convictions which were each scored one. Mr. Tavares does not challenge the calculation of any of the remaining six one-point convictions. Because the Guidelines provide in section 4A1.1(c) that the maximum number of one-point prior offenses that can be counted in the criminal history category is four, eliminating two of these offenses still leaves six, more than the four permitted. The exclusion of Mr. Tavares's juvenile adjudications, therefore, would not alter his criminal history category calculation and so would not alter his sentence (even if the district court had based Mr. Tavares's sentence on his criminal history category, which it did not). Therefore, we decline to consider Mr. Tavares's policy argument concerning the use of juvenile adjudications.

### e. Sentencing Memorandum

When sentencing above the guidelines range, the district

_____

[44] See, e.g., United States v. Gibbons, 553 F.3d 40, 46 (1st Cir. 2009); United States v. Melendez, 301 F.3d 27, 34-35 (1st Cir. 2002); cf. United States v. Matthews, 498 F.3d 25, 36 (1st Cir. 2007) (finding "no constitutional barrier to the use of [juvenile] adjudication[s] to support appellant's enhanced sentence" under the Armed Career Criminal Act).

court is required to articulate its reasoning for the upward departure. See 18 U.S.C. § 3553(c)(2). This requirement is met when the district court sets forth its reasoning in a written "statement of reasons" attached to the judgment. See, e.g., United States v. Vargas-Dávila, 649 F.3d 129, 130 (1st Cir. 2011). The district court's statement of reasons includes a copy of Mr. Tavares's sentencing transcript in which the court explained the imposition of his sentence.

Mr. Tavares makes much of the fact that on the statement of reasons, the district court wrote "sentencing memo to follow" in the space provided to justify the imposition of an above-guidelines sentence. No separate memo was ever produced. We see no error here. The district court adequately explained Mr. Tavares's above-guidelines sentence in the sentencing transcript and incorporated that transcript in the statement of reasons. The district court's decision to incorporate the sentencing transcript, which contained the required information, rather than to write its reasoning in the space provided, adequately fulfilled the requirement that the reasons for the imposition of the sentence be stated and is not reversible error.

### f. Adequate Explanation of Section 3553(a) Factors

Mr. Tavares also maintains that his sentence is procedurally unreasonable because the district court failed to consider the mandatory § 3553(a) factors, especially Mr. Tavares's

background and characteristics.

The district court believed that a term of imprisonment of 300 months "fully satisfie[d] the purposes of sentencing."[45] Our review of the record makes clear that the district court considered the mandatory § 3553(a) factors. "While the court ordinarily should identify the main factors upon which it relies, its statement need not be either lengthy or detailed." United States v. Turbides-Leonardo, 468 F.3d 34, 40 (1st Cir. 2006). We conclude that the district court's explanation is adequate. The court specifically mentioned Mr. Tavares's background several times--including his psychological report and family history--the sentences of co-defendants, deterrence and the violent nature of the crimes of conviction.[46] Given the record, we must conclude that the district court did not fail to consider the § 3553(a) factors or "fail[] to adequately explain the chosen sentence." Gall, 552 U.S. at 51.

Therefore, we conclude that Mr. Tavares's sentence was procedurally correct and substantively reasonable.

### 2. Mr. Jones's Sentencing

Mr. Jones challenges the procedural and substantive reasonableness of his sentence. He specifically challenges the use of his two prior convictions for resisting arrest as predicates for

---

[45] R.308 at 47.

[46] Id. at 43-44.

a career offender classification under the Guidelines and the district court's consideration of the § 3553(a) mandatory sentencing factors. He also contends that his sentence is substantively unreasonable because the district court gave insufficient weight to the report of Mr. Jones's forensic psychologist. We address these issues in turn.

### a. Career Offender Classification

The district court classified Mr. Jones as a career offender under United States Sentencing Guidelines section 4B1.1 based on his prior Massachusetts convictions for resisting arrest. Thus, Mr. Jones's offense level was set at thirty-four, resulting in an increased guidelines range. We review de novo a determination that a prior conviction qualifies as a predicate offense for the purposes of the career offender Guideline. See United States v. Almenas, 553 F.3d 27, 31 (1st Cir. 2009).

United States Sentencing Guidelines section 4B1.1(a) classifies a defendant as a career offender if (1) he was at least eighteen years old at the time he committed the offense of conviction, (2) the instant offense is a crime of violence and (3) the defendant has at least two prior felony convictions of a crime of violence. Mr. Jones urges that his convictions for resisting arrest cannot be the basis for his career offender classification because resisting arrest is not a crime of violence. We consistently have rejected this argument. In Almenas, we held that

resisting arrest under Massachusetts law is a crime of violence within section 4B1.1(a). 553 F.3d at 32-35. We reaffirmed this conclusion recently in United States v. Grupee, 682 F.3d 143, 149 (1st Cir. 2012), and United States v. Davis, 676 F.3d 3, 7 (1st Cir. 2012).

Mr. Jones attacks Almenas (and its progeny) as inconsistent with the Supreme Court's decision in Chambers v. United States, 555 U.S. 122 (2009), decided after our decision in Almenas. However, we rejected this claim in United States v. Weekes, 611 F.3d 68, 72-73 (1st Cir. 2010). Therefore, the district court did not err in classifying Mr. Jones as a career offender under the Guidelines.

### b. Remaining Challenges to Mr. Jones's Sentence

"[A reviewing court] must first ensure that the district court committed no significant procedural error . . . . Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." Gall, 552 U.S. at 51. Accordingly, "[o]ur first task is to determine whether the district court made any procedural errors . . . . If the district court has committed no such procedural error, we then review the substantive reasonableness of the sentence imposed and review the sentence for abuse of discretion." Marsh, 561 F.3d at 85-86 (internal quotation marks

omitted). "[W]e afford the district court wide discretion in sentencing." Id. at 86. Here, because Mr. Jones did not object to the substantive reasonableness of his sentence before the district court, we review for plain error. See Matos-Quiñones, 456 F.3d at 20-21.

Mr. Jones submits that the district court committed significant error by failing to consider the mandatory § 3553(a) factors, to make explicit reference to those factors and otherwise to explain adequately his sentence.

The record demonstrates that the district court explicitly considered the § 3553(a) factors. It identified the main factors upon which it relied in sentencing Mr. Jones, emphasizing the connection between the sentence imposed and the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and the avoidance of unwarranted sentence disparities. Although the district court's discussion of these factors was brief, "we do not require the court to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision." Marsh, 561 F.3d at 86 (internal quotation marks omitted).

The district court also addressed adequately Mr. Jones's history and characteristics. It discussed his psychologist's report detailing his family background, his history of restraining orders and his statement to the court. However, after considering

-56-

all of the relevant factors, the district court found that the gravity of the offense trumped any weight that might otherwise be given to Mr. Jones's background. The district court stated:

> While I have read the report that [Mr. Jones's counsel] handed up, there are frankly certain offenses that are so serious that even if there's an explanation for it in someone's background and history and even if you can draw a straight line from who they were to who they are now, and if you can understand it, there are some offenses that can't be explained, can't be justified. This is one of them.[47]

In Mr. Jones's view, this statement indicates the district court's refusal to consider his history and characteristics--a mandatory factor under § 3553(a). We cannot accept this argument. The district court considered Mr. Jones's history and characteristics, but after reviewing these factors, still believed that the nature of the offense and surrounding circumstances required the sentence imposed. The district court committed no procedural error in making that determination.

We now address the substantive reasonableness of Mr. Jones's sentence.

Mr. Jones faults the district court for failing to give

---

[47] R.303 at 17.

"significant weight" to the report of his forensic psychologist.[48] The district court stated that it considered this report.[49] Mr. Jones contends, however, that, because the district court relied on his treatment of the victims in determining his sentence, the district court also should have considered the mitigating circumstances in his background that may have caused his behavior. We cannot accept this contention. "That the sentencing court chose not to attach to certain of the mitigating factors the significance that the appellant thinks they deserved does not make the sentence unreasonable." United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011). Here, the district court considered Mr. Jones's mitigating evidence but was not persuaded by it.

We therefore conclude that Mr. Jones's sentence was procedurally correct and substantively reasonable.

## Conclusion

For the reasons set forth in this opinion, Mr. Tavares's and Mr. Jones's convictions and sentences are hereby affirmed.

**AFFIRMED**

---

[48] Appellant Jones's Br. 60.

[49] R.303 at 17.