# STATE OF CONNECTICUT *v.* DAMARQUIS GRAY
## (SC 20368)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.*

*Syllabus*

Convicted of numerous crimes, including felony murder, in connection with
the shooting death of the victim, the defendant appealed to this court.
During the course of the defendant's trial, the trial court detained three
eyewitnesses to the shooting, W, G, and H, who were reluctant to testify.
Due to the state's difficulty in locating and serving subpoenas on W and
H, the trial court issued material witness warrants pursuant to statute
(§ 54-82j) to secure their appearance at trial. After completing his direct
examination of W, the prosecutor requested that W be detained overnight
to ensure that she return the next day for cross-examination. When W's
assigned counsel indicated that W did not have overnight childcare
for her daughter, the court first suggested that the state contact the
Department of Children and Families but then gave W time to make
childcare arrangements, which she ultimately was successful in doing.
The trial court also granted the prosecutor's request to detain H for an
additional night in light of H's demeanor at trial and his prior efforts to
avoid the state's subpoenas. H's testimony was then delayed for another
day because the testimony of certain other witnesses was prioritized,

---

* This case was originally argued before a panel of this court consisting
of Chief Justice Robinson, and Justices McDonald, D'Auria, Kahn, Ecker
and Keller. Thereafter, Justice Mullins was added to the panel and has read
the briefs and appendices, and listened to a recording of the oral argument
prior to participating in this decision.

State *v.* Gray

but the court released H with electronic monitoring at the request of H's assigned counsel. In addition, although G initially appeared at trial pursuant to a subpoena, she failed to appear the next day because her mother was unavailable to drive her to the courthouse. The court confirmed that G was twenty-one years old and ordered that she be taken into custody pursuant to the capias statute (§ 52-143 (e)). After G was brought to court, the prosecutor requested that she, too, be detained. G's assigned counsel argued that G was five months pregnant and that her initial appearance indicated her willingness to testify. The court, however, was not satisfied that electronic monitoring would be sufficient to ensure her appearance and ordered that she be held overnight. The following day, the court allowed G's assigned counsel to attempt to secure electronic monitoring, but those efforts were unsuccessful, and G was detained for an additional night before completing her testimony. Defense counsel did not at any time object to the detention of W, G, or H. With respect to the substance of the testimony of the various witnesses, because W and another witness, L, testified that they lacked any memory of the shooting, the prosecutor reenacted portions of their respective grand jury testimony, whereby a court clerk read from the grand jury transcripts containing W's and L's answers. Defense counsel did not object to the reenactment but did object to the admission of certain portions of W's grand jury testimony that were consistent with W's in-court testimony, pursuant to *State* v. *Whelan* (200 Conn. 743), in which this court adopted a hearsay exception allowing the substantive use of prior inconsistent statements. The trial court overruled the objection, concluding that the admission of the consistent portions was necessary to avoid confusing the jury. After the reenactment, the prosecutor moved to introduce the transcripts of W's and L's grand jury testimony. Defense counsel objected on the ground that the reenactment rendered the admission of the transcripts cumulative, but the trial court disagreed and admitted the transcripts as full exhibits. *Held*:

1. The defendant's unpreserved claim that the trial court had violated his federal constitutional right to due process by detaining W, G, and H on the ground that such detention had a coercive effect on their testimony, thereby rendering that testimony involuntary, failed under the third prong of *State* v. *Golding* (233 Conn. 213), this court having concluded that, although the in-court attendance of W, G, and H was compelled by the material witness process or the issuance of a capias, the detention of those witnesses did nothing more than compel their appearance at trial and did not influence the substance of their testimony: W, G, and H each received the benefit of appointed counsel to advocate for their rights, as well as the conditions of their confinement and the terms of their release, the jury was aware of the circumstances underlying their testimony, as each witness testified that he or she was not testifying voluntarily and had been detained as a material witness but was giving

342 Conn. 657        MARCH, 2022        659

State *v.* Gray

testimony without any influence or seeking favor, and, even though it took several days for each witness to finish his or her testimony, there was no evidence that the inherently coercive aspects of the procedures employed, including the overnight detention, affected the reliability of their in-court testimony; moreover, defense counsel had the opportunity to cross-examine each witness but, rather than questioning them about the circumstances of their in-court testimony, focused on the inconsistencies in their various statements, and, in the absence of separate findings concerning the coercive effects of the witnesses' detention on the substance and voluntariness of their testimony, or any cross-examination on that point, the defendant failed to establish that the witnesses' testimony, as opposed to the witnesses' attendance, was compelled; nonetheless, this court emphasized that trial courts always should employ the least restrictive means necessary to ensure a witness' appearance at trial, urged trial courts to instruct detained witnesses that only their presence is compelled and that the substance of their testimony will not be considered in determining when they will be released from custody, as the trial court instructed H before releasing him with electronic monitoring, and observed several instances in the present case that raised concerns about whether the witnesses' liberty interests were adequately considered, specifically, placing the burden on the witnesses and G's counsel, in particular, to seek out electronic monitoring, referring to the power of the Department of Children and Families in responding to W's childcare concerns, which could have had an unduly coercive effect on W's testimony, and prioritizing the testimony of other witnesses over that of H.

(*One justice concurring separately*)

2. The defendant could not prevail on his claim that the trial court had abused its discretion in admitting, pursuant to *Whelan*, both consistent and inconsistent statements from W's and L's grand jury testimony:

a. This court declined to review the defendant's claim, raised for the first time on appeal, that the trial court had abused its discretion in admitting W's and L's grand jury testimony for substantive purposes under *Whelan* on the ground that W's and L's prior statements during the grand jury proceedings were unreliable: defense counsel objected to the admission of the grand jury testimony only on the ground that the transcripts were cumulative in light of the reenactment of their grand jury testimony at the defendant's trial, and, when the trial court specifically asked whether counsel objected to the admission of the grand jury testimony under *Whelan*, counsel indicated that he had "no legal basis" to do so; accordingly, the defendant's claim on appeal that the trial court should have limited the admission of the prior statements of W and L in their grand jury testimony to impeachment purposes only because those statements were unreliable was not preserved for appellate review.

State *v.* Gray

b. The trial court did not abuse its discretion in admitting the portions of W's grand jury testimony that were consistent with W's in-court testimony; that court properly considered the nature of the testimony, as well as its implications on the jury, and correctly determined that the challenged, consistent portions of the grand jury testimony were necessary to avoid confusing the jury and to provide context for the inconsistent statements admitted pursuant to *Whelan*.

c. The trial court did not abuse its discretion in admitting the transcripts of W's and L's grand jury testimony following the reenactment thereof during the defendant's trial: during their in-court testimony, both W and L claimed that they did not recall testifying to the statements that they made during their grand jury testimony, and neither admitted to the substance of their prior statements before the grand jury; moreover, the transcripts could have been admitted into evidence first and subsequently read from, doing so in reverse did not render the admission of the transcripts cumulative, and the jury would have been free to request playback of the relevant testimony at any time during its deliberations, such that the admission of the grand jury transcripts did not emphasize or increase their availability to the jury.

Argued May 5, 2021—officially released March 29, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Vitale, J.*; verdict and judgment of guilty of felony murder, criminal attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and carrying a pistol without a permit, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Patrick K. Griffin*, state's attorney, *Michael Pepper*, senior assistant state's attorney, and *Lisa D'Angelo*, assistant state's attorney, for the appellee (state).

State *v.* Gray

*Desmond M. Ryan* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*James B. Streeto*, senior assistant public defender, *Christine Perra Rapillo*, chief public defender, and *Jennifer Bourn*, supervisory assistant public defender, filed a brief for the Division of Public Defender Services as amicus curiae.

*Opinion*

ROBINSON, C. J. This appeal requires us to consider the extent to which the detention of witnesses in order to secure their attendance at a criminal trial constitutes coercion that implicates the due process rights of a criminal defendant, as well as the practices that a trial court may employ to mitigate the potentially coercive effects of the detention process. The defendant, Damarquis Gray, appeals[1] from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, among other crimes. On appeal, the defendant claims that the trial court (1) violated his federal due process rights by detaining three eyewitnesses to secure their attendance at trial because those detentions resulted in coerced and involuntary testimony in the state's favor, and (2) abused its discretion by permitting the prosecutor to read both inconsistent and consistent passages from the witnesses' grand jury transcripts to the jury for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). We conclude that (1) with respect to the defendant's first claim, which is unpreserved, he has not established a due process violation under the third prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), and

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* Gray

(2) the trial court's *Whelan* ruling was not an abuse of its discretion. Accordingly, we affirm the judgment of the trial court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history. On January 20, 2014, the defendant was with a group of his friends, including Anton Hall and Delano Lawrence, at his house. Around the same time, Daryl Johnson was at his house with his sister, Alexis, and her friends, Chyna Wright and Erika Gomez. Upon learning that the victim, Durell Law, had been " 'messing with' " Alexis, Johnson decided to confront the victim. At trial, Hall testified that the defendant and his friends set out from his house to rob the victim of his iPhone and money. Thereafter, the defendant separated from his group and met up with the victim, Alexis, Wright, and Gomez. Wright proceeded to tell the defendant that Johnson intended to fight the victim, and the defendant once again separated to meet back up with his original group. Upon meeting back up with his friends, the defendant was handed a gun. At trial, Gomez and Wright testified that the defendant and his friend, Tymaine Riddick, approached the victim to rob him. The victim then struck the defendant, who subsequently shot the victim, fatally wounding him.[2]

An investigative grand jury was impaneled on June 2, 2015, pursuant to General Statutes § 54-47b. The defendant was subsequently arrested, and the state charged him with murder, felony murder, attempt to commit robbery in the first degree, conspiracy to commit robbery in the first degree, and carrying a pistol without a permit. The case was tried to a jury. At trial, Wright, Gomez, Hall, and Lawrence all testified about the events of January 20, 2014. The jury found the defendant guilty

---

[2] We note that the defendant argued at trial that he was, at most, a bystander to Johnson, who had shot the victim.

State *v.* Gray

on all counts except murder. The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective term of forty-seven years' imprisonment. This appeal followed. Additional relevant facts and procedural history will be set forth in the context of each claim on appeal.

I

The defendant first claims that his federal due process right against testimony resulting from pressure or coercion was violated when Wright, Gomez, and Hall, who were material witnesses, were arrested and taken into custody pursuant to the material witness statute, General Statutes § 54-82j,[3] or the capias statute, General Statutes § 52-143 (e).[4] The defendant argues that the

[3] General Statutes § 54-82j provides in relevant part: "Upon the written complaint of any state's attorney addressed to the clerk of the superior court for the judicial district wherein such state's attorney resides, alleging (1) that a person named therein is or will be a material witness in a criminal proceeding then pending before or returnable to the superior court for such judicial district, and in which proceeding any person is or may be charged with an offense punishable by death or imprisonment for more than one year, and (2) that the state's attorney believes that such witness is likely to disappear from the state, secrete himself or otherwise avoid the service of subpoena upon him, or refuse or fail to appear and attend in and before such superior court as a witness, when desired, the clerk or any assistant clerk of the court shall issue a warrant addressed to any proper officer or indifferent person, for the arrest of the person named as a witness, and directing that such person be forthwith brought before any judge of the superior court for such judicial district, for examination. . . ."

[4] General Statutes § 52-143 (e) provides: "If any person summoned by the state, or by the Attorney General or an assistant attorney general, or by any public defender or assistant public defender acting in his official capacity, by a subpoena containing the statement as provided in subsection (d) of this section, or if any other person upon whom a subpoena is served to appear and testify in a cause pending before any court and to whom one day's attendance and fees for traveling to court have been tendered, fails to appear and testify, without reasonable excuse, he shall be fined not more than twenty-five dollars and pay all damages to the party aggrieved; and the court or judge, on proof of the service of a subpoena containing the statement as provided in subsection (d) of this section, or on proof of the service of a subpoena and the tender of such fees, may issue a capias

State *v.* Gray

detention of these witnesses had a coercive effect that rendered their testimony involuntary. The state responds that the defendant has not satisfied the conditions established in *State* v. *Golding*, supra, 213 Conn. 239–40, for appellate review of unpreserved constitutional claims. In particular, the state contends that the record is inadequate for review under *Golding*'s first prong and that the defendant has failed to satisfy *Golding*'s third prong because, although the witnesses' attendance at trial was compelled, the record establishes that, once in the courtroom, the material witness process did not compel them to testify in any particular way. Although we agree with the state's argument under the third prong of *Golding*, we nevertheless emphasize that our review of the record reflects how important it is for a trial court to consider the least restrictive means necessary to ensure that a witness appears to testify and to balance the witness' liberty interests along with the interests of the state and the defendant in the witness' availability and testimony.

A

The record reveals the following additional relevant facts. Wright, Gomez, and Hall were all eyewitnesses to the shooting. Wright was residing in North Carolina prior to the trial and failed to accept the service of an interstate subpoena. The prosecutor's office in North Carolina communicated to the state that it had been unable to serve Wright with a subpoena, and Wright's grandmother informed North Carolina authorities that Wright had no intention of testifying in Connecticut. Upon Wright's return to Connecticut, the state attempted to locate her to serve her with a subpoena but was unsuccessful. A material witness warrant was issued the following day pursuant to § 54-82j, resulting in her

directed to some proper officer to arrest the witness and bring him before the court to testify.''

State *v.* Gray

appearance at trial. At trial, the majority of Wright's
testimony consisted of her stating that she did not
remember the course of events that took place prior to
the shooting or the statements that she made during her
grand jury testimony. Upon the conclusion of direct
examination by the state, the court heard arguments to
determine which measures would be necessary to ensure
Wright appeared at trial the following day. The state
argued that, because Wright had been difficult to serve
with a subpoena and had made clear that she did not
want to testify, "continuing to hold [her would] ensure
her availability . . . for cross-examination [the next
day]." In response, Wright's assigned counsel argued that
the least restrictive means should be used to ensure
Wright's appearance in court, that Wright understood
the seriousness of her attendance, and that detention
would result in hardship for her because she would be
unable to arrange childcare for her daughter.

The trial court stated that it was "concerned with the
fact that, based on what [the court] heard from the state,
and based, frankly, on [Wright's] conduct here before
the court, her demeanor, her response to the questions
that are being asked, and the circumstances that gave
rise . . . to her being here . . . [the court has] no rea-
son at this point to doubt . . . that her grandmother
provided false information to the authorities [and] that
[Wright] had no intention of willingly testifying in Con-
necticut . . . . So, based on all those reasons, the
court believes she's a risk of nonappearance." Acknowl-
edging "the ramifications" of detaining Wright, the court
nevertheless concluded that it was appropriate to do
so. When Wright claimed that she would not be able
to obtain childcare if she were detained, the trial court
responded that it "suppose[d] [that] the state is going
to be required to contact [the Department of Children
and Families] if she is indicating that she is not going
to be able to have [an] arrangement to take care of her

State *v.* Gray

child while she's incarcerated . . . .'' The trial court then gave Wright and her counsel time to arrange childcare, which they were ultimately successful in doing. Wright appeared the following day to testify and continued to testify as to her lack of memory; she was released from custody at the conclusion of her testimony.

The next witness, Gomez, was similarly reluctant to appear for trial. During a hearing on a second capias, Douglas Jowett, an inspector with the prosecutor's office, testified that he served a subpoena on Gomez to appear on October 1, 2018, but that she had indicated to him that she had no intention of testifying. Although Gomez subsequently appeared to testify on October 1, Jowett instructed her to appear the following day instead because of the trial schedule. Gomez then failed to appear on October 2, 2018. Gomez' mother informed Jowett that her work schedule conflicted with the new time for Gomez' testimony on October 2, 2018, which rendered Gomez unable to testify because she could not get to the courthouse without transportation provided by her mother. The trial court, upon confirming that Gomez was twenty-one years old, determined that her mother's work schedule was irrelevant and issued a capias ordering that Gomez be brought to court without bond until further order. On October 3, the state requested that Gomez be detained. In response, Gomez' assigned counsel argued that Gomez had no history of arrest or conviction, was five months pregnant, and that her prior appearance on October 1 indicated her willingness to testify.

The trial court concluded that there was ''certainly . . . materiality in connection with what her anticipated . . . testimony is going to be. But, obviously, unfortunately [York Correctional Institution] is well equipped to deal with inmates who are pregnant. So she's twenty-one, she's certainly an adult now . . . .

State *v.* Gray

I'm not satisfied that [electronic] monitoring under the circumstances is going to be sufficient, particularly given the comments made that she had no plans of coming or attending; that seemed to be borne out by her nonappearance on Tuesday.''

Gomez began her testimony on October 4. Upon the close of her testimony, the court allowed Gomez' counsel to attempt to secure electronic ankle monitoring for her but learned that it was unavailable. The court indicated that it would have been ''inclined to release [Gomez] if [it] could have been adequately assured of [her] return . . . tomorrow by use of some kind of electronic monitoring so that [Gomez'] whereabouts overnight could be determined. . . . Given the situation here . . . what led to [Gomez'] having to be incarcerated, those facts are still what they are, and [Gomez is] now in [the] midst of [her] testimony, so it's even more vitally important that [she] return tomorrow. . . . [U]nfortunately, [the court is] going to have [Gomez] held again overnight.''

Similar to Wright and Gomez, the state had difficulty in locating the third witness, Hall, to serve him with a subpoena. The trial court subsequently issued a material witness warrant, and Hall was detained on October 3, 2018. The state did not call Hall to testify immediately, and, with a long weekend approaching, Hall's appointed counsel argued for his release on October 4, 2018. The trial court observed that Hall's demeanor during trial, as well as his avoidance of the state's subpoenas, ''did not instill the court with great confidence of his return if he was to be released.'' The court decided to detain Hall for another night and directed his counsel to return tomorrow with a plan for Hall's release should he not testify that day. The following day, October 5, 2018, Hall had not yet testified because of the need to complete the testimony by an out-of-state witness and a state laboratory employee. Hall's counsel asked the trial

State *v.* Gray

court to release him with electronic ankle monitoring, and the trial court released Hall from custody with the admonition that "[h]ow you answer the questions is up to you, but you have to be here. Understand?" Hall subsequently appeared and testified, initially denying any memory of the events leading up to the shooting but ultimately testifying that, although he did not wish to attend the trial because he was afraid of the defendant, the defendant and others had planned to rob the victim and that the defendant had shot the victim. Defense counsel did not object at any time to the detentions of Wright, Gomez, and Hall, the three material witnesses.

A defendant may prevail on an unpreserved claim under *Golding* when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*). "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). We conclude that the defendant has failed to demonstrate the existence of a due process violation for purposes of the third prong of *Golding* because there is no evidence that the witnesses' compelled attendance in court affected the substance of their testimony.

State *v.* Gray

We begin with the first prong of *Golding*, namely, whether the record is adequate for review of the defendant's claims. As the state points out, the trial court never ruled on any challenge to the voluntariness of any of the witnesses' statements in light of their detention because the defendant never raised the issue of voluntariness to the trial court. We therefore lack the benefit of any factual findings the trial court would have made regarding the witnesses' demeanor, their answers to questioning, and other circumstances surrounding their testimony, which would have informed whether that testimony was in fact coerced or involuntary as a result of their detentions. Although the ultimate determination of voluntariness is a legal determination that is subject to plenary review; see, e.g., *State* v. *Lawrence*, 282 Conn. 141, 153–54, 920 A.2d 236 (2007); the factual predicates for that legal determination are findings that are within the province of the trial court. See *State* v. *Christopher S.*, 338 Conn. 255, 274–75, 257 A.3d 912 (2021) (deference is afforded to trial court's factual findings regarding voluntariness of defendant's statement); *State* v. *Lawrence*, supra, 153 ("we give deference to the trial court concerning . . . factual determinations" of voluntariness (internal quotation marks omitted)); *State* v. *Medina*, 228 Conn. 281, 300–301 and n.24, 636 A.2d 351 (1994) (emphasizing that determination of voluntariness is not pure question of law and requires factual findings by trial court). Nevertheless, we disagree with the state's argument that the record is inadequate for review insofar as the record reflects the circumstances under which the three witnesses were detained, along with their subsequent in-court testimony that the defendant challenges in this appeal.[5] To the extent that there

_____

[5] Because the relevant facts are apparent from the record, this renders distinguishable those cases in which the record was deemed to be inadequate to review constitutional challenges to out-of-court events, such as statements that are claimed to be involuntary, under *Golding*. See *State* v. *Medina*, supra, 228 Conn. 300 (record was inadequate to review claim of involuntary confession under *Golding* because defendant "did not clearly raise [that]

State *v.* Gray

are gaps in the record created by the unpreserved nature of this claim, they affect the defendant's burden of establishing the existence of a constitutional violation under the third prong of *Golding* rather than the reviewability of the claim under the first prong.

Turning to the second prong of *Golding*, we note that the state does not dispute the constitutional nature of the defendant's claim. Thus, we assume, without deciding, that the detention of a witness, either pursuant to a capias under § 52-143 (e) or as a material witness pursuant to § 54-82j, may take place under circumstances that are so coercive as to render the witness' testimony at trial false or otherwise unreliable, rendering its use a violation of a defendant's due process rights.[6] See *United States* v. *Tavares*, 705 F.3d 4, 22 (1st

claim in the trial court, the state was not put on notice that it was required to defend against such a claim," and, accordingly, "neither the state nor the trial court—nor this court on appeal—had the benefit of a complete factual inquiry into the defendant's mental condition at the time his statements were made"); see also *State* v. *Brunetti*, 279 Conn. 39, 61, 901 A.2d 1 (2006) ("[b]ecause the state had no reason to adduce any evidence regarding . . . the consent to search, there was no meaningful factual inquiry into that issue, and, consequently, we have no idea what such an inquiry would have revealed and no idea what the trial court would have found about . . . consent or lack thereof"), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007); *State* v. *Daniels*, 248 Conn. 64, 80–81, 726 A.2d 520 (1999) (record was inadequate to review unpreserved constitutional claim that out-of-court identification violated defendant's due process rights because not all relevant facts were adduced in trial court), overruled in part on other grounds by *State* v. *Singleton*, 274 Conn. 426, 876 A.2d 1 (2005).

[6] Although the state does not dispute the constitutional magnitude of the defendant's claim on appeal for purposes of the second prong of *Golding*, we note that the federal courts are divided as to the extent to which coerced testimony by a witness violates a defendant's due process right to a fair trial. Indeed, the United States Supreme Court has not yet ruled such testimony unconstitutional per se. See *Samuel* v. *Frank*, 525 F.3d 566, 569 (7th Cir. 2008); see also *Walker* v. *United States*, 201 A.3d 586, 595 n.6 (D.C. 2019) (citing authorities and noting that "[s]ome courts recognize a defendant's right to challenge involuntary witness statements on due process grounds, but they require a showing that the witness testimony is false or unreliable or that there was extreme government misconduct"); K. Sheridan, Note, "Excluding Coerced Witness Testimony To Protect a Criminal Defendant's Right to Due Process of Law and Adequately Deter Police Misconduct," 38

State *v.* Gray

Cir.), cert. denied, 571 U.S. 964, 134 S. Ct. 450, 187 L. Ed. 2d 301 (2013), and cert. denied sub nom. *Jones* v. *United States*, 569 U.S. 986, 133 S. Ct. 2371, 185 L. Ed. 2d 1089 (2013); *Raphael* v. *State*, 994 P.2d 1004, 1010 (Alaska 2000). Nevertheless, the defendant's claim founders on the third prong of *Golding* because the record does not reveal any evidence that the detention of the witnesses did anything more than legally compel their attendance in court for the defendant's trial.

Fordham Urb. L.J. 1221, 1256 (2011) (The author argues that "the [United States] Supreme Court should read the [c]onstitution so that: (1) criminal defendants have standing to contest admission of coerced witness testimony; and (2) all coerced statements of a witness will be excluded, regardless of their reliability. This method will best uphold the policy of the exclusionary rule: to deter police misconduct and [to] protect the constitutional due process rights of criminal defendants.").

With respect to this division, some courts have concluded that coerced witness statements violate due process only if they are actually false or otherwise shown to be unreliable. See *Avery* v. *Milwaukee*, 847 F.3d 433, 439 (7th Cir.) ("[b]ecause coerced testimony may in fact be true, the [due process] right to a fair trial [is not] implicated absent a violation of the . . . duty to disclose facts about the coercive tactics used to obtain it" pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)), cert. denied sub nom. *Hernandez* v. *Avery*,　　U.S.　　, 137 S. Ct. 2249, 198 L. Ed. 2d 680 (2017); *United States* v. *Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) (due process is violated if "[the] witness was coerced into making *false* statements" (emphasis in original)); *United States* v. *Merkt*, 764 F.2d 266, 274–75 (5th Cir. 1985) (even if law enforcement elicited coerced statements at issue, coercion was not sufficiently egregious to exclude evidence). On the other hand, the United States Court of Appeals for the First Circuit has held that the use of any illegally coerced testimony may be a violation of due process. See *LaFrance* v. *Bohlinger*, 499 F.2d 29, 34 (1st Cir.) ("Due process does not permit one to be convicted [on the basis of] his own coerced confession. It should not allow him to be convicted [on the basis of] a confession wrung from another by coercion." (Internal quotation marks omitted.)), cert. denied sub nom. *Meachum* v. *LaFrance*, 419 U.S. 1080, 95 S. Ct. 669, 42 L. Ed. 2d 674 (1974), and cert. denied sub nom. *LaFrance* v. *Meachum*, 419 U.S. 1080, 95 S. Ct. 669, 42 L. Ed. 2d 674 (1974),; cf. *Bradford* v. *Johnson*, 354 F. Supp. 1331, 1336–38 (E.D. Mich. 1972) (defendant had standing to assert due process violation stemming from use of coerced witness testimony), aff'd, 476 F.2d 66 (6th Cir. 1973). Because the state does not dispute the constitutional magnitude of the defendant's claim, and we resolve this claim under the third prong of *Golding*, we leave this issue to another day.

State *v.* Gray

The decision of the United States Court of Appeals for the First Circuit in *United States* v. *Tavares*, supra, 705 F.3d 4, is instructive with respect to the distinction between the legal compulsion of a witness' appearance in court and the coercion of testimony that gives rise to a due process violation. In *Tavares*, a defendant named Eddie Jones challenged his conviction for "knowingly transporting a minor, K.S., in interstate commerce with the intent that she engage in prostitution," among other crimes. Id., 21. K.S. was a very reluctant witness who testified at trial only because she had been subpoenaed and because a federal prosecutor and Federal Bureau of Investigation (FBI) agents had threatened her with incarceration and losing custody of her daughter after she had been arrested for failing to appear. Id., 21–22; see id., 22 (K.S. also had discarded summons to appear before grand jury). Jones argued that K.S.'s testimony for the government "was coerced and that its admission into evidence violated his [f]ifth [a]mendment right to due process." Id., 21. Discussing *United States* v. *Hall*, 434 F.3d 42, 57–58 (1st Cir. 2006), a prosecutorial misconduct case, the First Circuit observed that, "unlike [g]overnment efforts to prevent the testimony of certain witnesses, [t]here is no blanket rule against inducements by the government to witnesses to produce truthful testimony." (Internal quotation marks omitted.) *United States* v. *Tavares*, supra, 22. Nevertheless, the court "recognized the possibility that, in extreme circumstances, government [misconduct] could occur through improper efforts to shape testimony to the government's liking." (Internal quotation marks omitted.) Id.

Applying these principles, the First Circuit determined in *Tavares* that there was "no constitutional violation." Id. The court viewed the actions of the federal prosecutor and FBI agents not as " 'threats' " but "more accurately . . . as lawful coercion of a reluctant witness to

State *v.* Gray

testify as required by law. *Such 'threats' are the legal consequences for failing to appear pursuant to a summons.*" Id. (Emphasis added.) The court further emphasized that Jones had "fully cross-examined K.S. on this issue. There was ample testimony in the record to permit the jury to evaluate K.S.'s credibility in light of all these circumstances."[7] Id., 22–23.

Significantly, in rejecting Jones' claim "that the [D]istrict [C]ourt committed plain error in not conducting an evidentiary hearing [as to the coercion] prior to admitting the testimony" of K.S., the First Circuit distinguished *Tavares* from *LaFrance* v. *Bohlinger*, 499 F.2d 29, 35 (1st Cir.), cert. denied sub nom. *Meachum* v. *LaFrance*, 419 U.S. 1080, 95 S. Ct. 669, 42 L. Ed. 2d 674 (1974), and cert. denied sub nom. *LaFrance* v. *Meachum*, 419 U.S. 1080, 95 S. Ct. 669, 42 L. Ed. 2d 674 (1974), which involved a claim that a previous statement was a fabrication obtained while the witness was under the influence of narcotics. See *United States* v. *Tavares*, supra, 705 F.3d 23. The court observed "a material and qualitative distinction between the prosecutorial misconduct at issue in *LaFrance* and the situation [involving Jones]. *LaFrance* dealt with police extraction of a statement from a [drug impaired] witness, by means which [the court] described as 'police threats and other blatant forms of physical and mental duress.' . . . In her testi-

---

[7] "On direct examination, K.S. admitted that she did not want to testify, but was doing so under a subpoena. [Jones'] counsel conducted a full cross-examination of K.S. During that cross-examination, she agreed with defense counsel that she had been threatened by FBI agents and a federal prosecutor with remaining in jail after she was arrested for failing to appear as required by a summons and with losing custody of her daughter if she did not 'do what [they] wanted [her] to do.' She also agreed she was just going to tell the prosecution what they wanted to hear so she could move on with her life. On redirect, K.S. stated that she had been threatened by the FBI and federal prosecutors when she had been required to appear before the grand jury four years earlier and admitted that she had not told the [D]istrict [C]ourt that she had been threatened." (Footnote omitted.) *United States* v. *Tavares*, supra, 705 F.3d 21–22.

State *v.* Gray

mony, K.S. related on cross-examination instances of lawful pressure. *She was apprised of the lawful consequences of her failing to testify, which she was legally required to do.* The purpose of informing her of those legal consequences, moreover, was to ensure that she fulfilled her obligation to testify, *not to ensure that she give particular testimony.*'' (Citation omitted; emphasis added.) Id.; cf. *United States* v. *Vangates*, 287 F.3d 1315, 1323–24 (11th Cir. 2002) (action of subpoenaing witness to court does not coerce that witness to waive fifth amendment privilege against self-incrimination).

In contrast to *Tavares*, the Alaska Supreme Court's decision in *Raphael* v. *State*, supra, 994 P.2d 1004, provides an example—rare in the case law—of when a trial court's decision to detain a witness has a sufficiently coercive effect on that witness to constitute a violation of a criminal defendant's due process rights. *Raphael* was a domestic violence case in which the prosecutor told the judge at an ex parte hearing during a kidnapping and assault trial ''that the complaining witness, I.W., was likely to recant, was intoxicated, and should be incarcerated until she testified''; she also had been evicted from a shelter at which the prosecutor had arranged for her to stay. Id., 1006. Without first notifying the defendant, Wilfred Raphael, or his attorney of the prosecutor's ex parte claims, ''the trial judge granted the prosecutor's request, jailing I.W. and placing her children in protective custody.'' Id. At that time, the trial judge stated to I.W.: ''I'm going to order that you be remanded into custody on the case, no bail, and you're—she's not to have any contact with [Raphael]. *And she's going to be—once the testimony is done, then we'll revisit it. And she gives testimony and we'll revisit the case, and presumably let her—she'll be able to be released.*'' (Emphasis added; internal quotation marks omitted.) Id., 1007. I.W. was then incarcerated for three days before it was her turn to testify, and she

State *v.* Gray

remained in custody during the defense case; during her testimony, she "described Raphael's conduct before, during, and after the alleged assault in a manner that comported with her earlier inculpatory testimony before the grand jury." Id.

The Alaska Supreme Court agreed with Raphael's argument that, "by summarily incarcerating I.W. and taking away her children, the trial court and the [s]tate coerced I.W. into testifying against Raphael, thus violating Raphael's right to due process." Id. The court observed that "[s]tatements that are the product of coercion may be unreliable and untrustworthy, and thus should be excluded as evidence against one not coerced into making them. Although a trial court may use its subpoena power to force a witness to testify, coercion and intimidation of witnesses by the [s]tate [are] improper. This rule applies to witnesses for the [s]tate as well as the defense." (Footnotes omitted; internal quotation marks omitted.) Id.; see id., 1008 (rejecting state's standing argument because "both [Alaska] case law and that of other jurisdictions uniformly recognize a defendant's ability to assert a due process violation based on the coercion of witnesses whose statements are used against the defendant at trial"). Reviewing "the totality of the circumstances surrounding a [witness'] testimony to determine the coercive effect of the trial court's and [the] prosecutor's conduct," the court held that "the actions and statements of the trial court were coercive." Id., 1008. The court specifically concluded that "the trial court's [near total] denial of I.W.'s due process rights sent the message that she was at the mercy of the power of the [s]tate and that I.W. thus did not feel free to testify unfavorably to the [s]tate." (Internal quotation marks omitted.) Id.

Likening the trial court's treatment of I.W., who did not have an opportunity to be heard, to an "English [c]ourt of the Star Chamber" proceeding, the Alaska

State *v.* Gray

court emphasized that the trial court had "denied I.W. nearly all of the basic fundamental protections that a defendant in a civil contempt proceeding must receive to comport with due process, including the right to counsel . . . ." (Internal quotation marks omitted.) Id., 1008–1009. The Alaska court further relied on the trial court's juxtaposition of a no contact order between I.W. and Raphael with its statement that it would " 'revisit' " I.W.'s detention after her testimony, including custody of her children; id.,1007; to conclude that "the trial judge conveyed the strong impression that I.W.'s release from imprisonment was conditioned not only on *whether* she testified, but on *how* she testified as well . . . ." (Emphasis in original.) Id., 1009; see id. (noting that, "[i]f the trial court conditioned I.W.'s imprisonment solely on her agreement to testify, no need for the trial court to 'revisit' any issue would exist," and that I.W. "could have interpreted the trial judge's statement that he 'hope[d]' [she] would be 'able to get home and get [her] kids' after trial as a veiled threat to keep her in jail if her testimony was not pleasing to the court or the [s]tate"). In holding that the coercion of I.W. violated Raphael's due process rights, the court emphasized that "I.W. did not refuse to testify. And even though [there was a concern] that her intoxication could impede her ability to testify, by threatening continued incarceration and by flagrantly ignoring the requirements of due process, the trial court and the [s]tate implied that they held the only key to I.W.'s freedom and that her sobriety and ability to testify would be insufficient to regain that freedom." Id.; see id., 1011 (concluding that error was harmful because defense counsel's "ability to cross-examine I.W. effectively regarding bias was limited at best" given ex parte nature of trial court's actions, and her "testimony was central to the [s]tate's case against Raphael" because only she "testified about Raphael's behavior before, during, and after the alleged assault").

State *v.* Gray

Significantly, the Alaska court observed that, "[e]ven [when] a witness has flatly refused to testify, a trial court should condition imprisonment solely on the [witness'] continued refusal to testify; once the witness testifies, the witness is no longer in contempt of court and the justification for incarceration disappears. In this way, a defendant in a civil contempt proceeding 'carries the key to her freedom in her own pocket.' '' (Footnote omitted.) Id., 1009. The court emphasized that "[its] holding . . . does not mean that all testimony by witnesses incarcerated in civil contempt proceedings is involuntary. Incarceration is a necessary remedial tool in a judge's arsenal when attempting to secure a recalcitrant [witness'] testimony. But . . . I.W. voluntarily appeared . . . and had not violated any court order. And when a witness can reasonably interpret a trial court's decision to imprison her as an attempt to influence the *substance* of her testimony . . . the risk that the witness may not testify freely and truthfully is too great. As a criminal defendant, Raphael ha[d] a constitutional right under the [d]ue [p]rocess [c]lause not to bear that risk." (Emphasis in original.) Id., 1010.

Several state court cases following *Raphael* emphasize the limited nature of that decision and, in the vein of *Tavares*, acknowledge the occasional necessity of detaining a material witness under appropriate circumstances to compel the witness' presence in court without influencing his or her testimony. See *Akelkok* v. *State*, 475 P.3d 1136, 1141–42 (Alaska App. 2020) (distinguishing *Raphael* because witness was detained after she had already twice failed to appear to testify under subpoena, she was intoxicated when brought to court on warrant and could not or would not provide her contact information, electronic monitoring was not available, and trial court's interactions with witness were to ensure "that the trial proceeded in an orderly and efficient manner, and that [the witness] addressed

State *v.* Gray

the attorneys' questions,'' that is, that ''she was capable of testifying that day—not that she testify a certain way''); *State* v. *Rice*, 135 N.E.3d 309, 320 (Ohio App. 2019) (*Raphael* was distinguishable because the defendant had a full opportunity to cross-examine the witness, a domestic violence victim who was present in court on a material witness warrant, insofar as the trial court had ''compelled [her] presence but did not coerce her testimony. Once on the stand, she was free to testify as she wished.''); *Skinner* v. *State*, 33 P.3d 758, 769–70 (Wyo. 2001) (distinguishing *Raphael* because, although domestic violence complainant was detained as material witness after state made several unsuccessful attempts to serve her with subpoena, prosecutor instructed witness during direct examination ''to testify truthfully and . . . she would in turn be released from incarceration,'' and defendant had cross-examined witness about circumstances of her detention), cert. denied, 535 U.S. 994, 122 S. Ct. 1554, 152 L. Ed. 2d 477 (2002).

Guided by the principles set forth in *United States* v. *Tavares*, supra, 705 F.3d 4, and *Raphael* v. *State*, supra, 994 P.2d 1004, our review of the record establishes that the detentions of the witnesses in this case did not have the coercive influence over their testimony necessary to give rise to a due process violation. Most significant, each witness received the benefit of appointed counsel to advocate for their due process rights, and conditions of confinement and release, unlike the complaining witness, I.W., in *Raphael*. Although the in-court presence of Hall, Gomez, and Wright was compelled via the material witness process or the issuance of a capias, there is no evidence that the inherently coercive aspects of those procedures, including the detention of the witnesses, rose to the level of affecting the reliability of their in-court testimony, even though it took several days of trial for each witness to testify.[8] The jury was

---

[8] We note that the defendant argues that the trial court improperly ''remarked on the witnesses' demeanor and the way they answered the

State *v.* Gray

aware of the circumstances underlying the testimony
of Hall, Gomez, and Wright, as each testified that they
were not in court testifying voluntarily and had been
detained as material witnesses but were giving testi-
mony without any influence or seeking favor. The
record discloses that Wright, in particular, did not
appear intimidated by the process; she was vocal about
her frustration with the length of the prosecutor's direct
examination, stating before the afternoon break on the
first day of her testimony that he was "[p]issing [her]
off" and openly discussing her fear of what might hap-
pen "outside in [the] community . . . after this testi-
mony." For her part, Gomez testified that she had
initially refused to testify, was in court pursuant to a
subpoena, and did not want to be there because people
had been calling her "a snitch," both online and in
the community, causing her to fear for her safety. Hall
testified that, because of his fear of the defendant and
being labeled a "snitch," he did not want to testify in
court at trial, and similarly had not wanted to speak to
the police or to testify before the grand jury. He had
been avoiding the prosecutor's office for weeks leading
up to the trial and did not review his testimony with
law enforcement; he was present in court only because
of a court order.[9] Finally, defense counsel had the
opportunity to cross-examine each witness but did not

prosecutor's questions in the remarks," namely, the court's observation
"that they claimed not to recall their prior grand jury testimony or police
statements." The defendant contends that the trial court improperly consid-
ered how the witnesses answered the state's questions in determining
whether they should remain detained. Read in context, we disagree with
the defendant's reading of the record. Rather, as each witness gave answers
on direct examination that conflicted with their grand jury testimony or
statements to the police, the necessity of questioning them about each of
those prior inconsistent statements could not help but extend the time of
detention necessary to complete their testimony.

[9] We note that, after Hall was given an electronic monitoring device to
allow him to leave custody midtrial and to attend his grandmother's funeral,
the trial court instructed Hall that, although his attendance was required,
"[h]ow you answer the questions is up to you . . . ."

State *v.* Gray

question the witnesses about the circumstances of their
in-court testimony. Rather, defense counsel effectively
cross-examined the witnesses about the inconsistencies
between their respective statements to the police, grand
jury testimony, and trial testimony, raising questions
about their veracity through admissions that they each
had lied at various times during the process. Given the
absence of separate findings about the coercive effects
of the detention on the substance and voluntariness of
their testimony, and without any cross-examination on
this point, we conclude that the defendant has not estab-
lished that the witnesses' testimony—as opposed to
their attendance—was compelled or coerced and that
this claim therefore fails under the third prong of
*Golding*.

B

Although we conclude that the defendant cannot pre-
vail on his unpreserved constitutional claims under
*Golding*, we nevertheless take this opportunity to
emphasize how important it is that trial courts employ
the least restrictive means necessary to ensure that a
material witness appears to give his or her testimony.
As discussed in the amicus curiae briefs filed by the
Connecticut Criminal Defense Lawyers Association and
the Division of Public Defender Services (division), the
material witness statutes, General Statutes § 54-82i et
seq., do not provide any guidance to trial courts as to
the appropriate interests to consider when determining
whether to detain a material witness. Section 54-82j
instructs only that a state's attorney may, on the grant-
ing of a written application, have any material witness
arrested if the state's attorney believes that such wit-
ness is "likely" to flee the state, avoid subpoena service,
or refuse to appear. The court may grant the request
and issue a warrant for the witness' arrest "when
desired . . . ." General Statutes § 54-82j. Once
detained, the witness may be held indefinitely "subject

State *v.* Gray

to the further orders of the judge.'' General Statutes
§ 54-82j.

The amicus curiae brief filed by the division explains
that our trial courts routinely consider the least restric-
tive means for ensuring a criminal defendant's presence
in court and argues that a similar analysis has value in
the context of determining whether to detain a material
witness. To this end, the rules of practice already pro-
vide a set of factors that a court applies in determining
which ''conditions of release will reasonably ensure
the appearance of the defendant in court,'' including
considerations of the defendant's (1) ''past record of
appearance in court,'' (2) ''family ties,'' (3) ''employment
record,'' (4) ''financial resources, character and mental
condition,'' and (5) ''community ties.'' Practice Book
§ 38-4 (b) (2) through (7).

The rules of practice also provide a hierarchical con-
sideration of the means available to reasonably ensure
that a criminal defendant appears in court besides incar-
ceration, including the defendant's (1) ''execution of a
written promise to appear without special conditions,''
(2) ''execution of a written promise to appear with
nonfinancial conditions,'' (3) ''execution of a bond with-
out surety in no greater amount than necessary,'' (4)
''deposit with the clerk of the court of an amount of
cash equal to 10 percent of the amount of [a] surety
bond set,'' and (5) ''execution of a bond with surety in
no greater amount than necessary.'' Practice Book § 38-
4 (a) (1) through (5); see also Practice Book § 38-4 (c)
(conditions of release for defendant charged with ''a
serious felony'' or ''a family violence crime''). Signifi-
cantly, when considering the imposition of nonfinancial
conditions on a criminal defendant, the trial court must
impose ''the least restrictive condition or combination
of conditions'' necessary to ensure the defendant's
appearance, including ''supervision [by] a designated
person or organization,'' restrictions on travel, or elec-
tronic monitoring. Practice Book § 38-4 (g) (1), (2) and
(8).

State *v.* Gray

As is evident from the rules of practice applicable to the release of criminal defendants, there are numerous means available to ensure that a witness appears to testify in court that are less restrictive than incarceration. This court has long recognized that "[i]t is the duty of all good citizens when legally required to do so to testify to any facts within their knowledge affecting [the] public interest and . . . [that] no one has a natural right to be protected in his refusal to discharge that duty." (Internal quotation marks omitted.) *State* v. *Andrews*, 248 Conn. 1, 12–13, 726 A.2d 104 (1999). This important duty and state interest, however, do not diminish a witness' interest in not being subject to overly restrictive means of ensuring his or her appearance. Consistent with our long established practice with respect to criminal defendants, we emphasize that our trial courts should always employ the least restrictive means necessary to ensure a witness' appearance at trial. To mitigate the unavoidably coercive effects of the detention process, we also urge our trial courts, as the trial court did with Hall, to instruct detained witnesses that only their presence is compelled and that the substance of their testimony will not be considered in determining when they will be released from custody. See id., 13–14 (The trial court did not infringe on the defendant's right to cross-examination by instructing the witness "that he was required to testify and [by] inform[ing] him of the consequences of his continued refusal to do so," because "the trial court did not suggest or imply that [the witness] should testify in any particular manner, either favorably or unfavorably to the defendant. Rather, the court, in neutral and appropriate terms, merely informed [the witness] that he was legally obligated to testify and that he faced incarceration if he wrongfully persisted in refusing to do so.").

By way of illustration, we observe three particular instances in the present case that raise concerns about

State *v.* Gray

whether the witnesses' liberty interests received adequate consideration, notwithstanding the apparent necessity for the implementation of measures to ensure their appearance in court. First, it is troubling that, initially, the witnesses were entirely burdened with the task of seeking out electronic monitoring, to no avail. For instance, appointed counsel for Gomez attempted, but failed, to secure electronic monitoring because the office responsible for providing that service had closed by the time the trial court permitted Gomez and Hall to seek that option, and there was confusion about which office could provide that service in the first instance. The trial court addressed this confusion the next day by requesting the presence in court of a member of the Office of Adult Probation, which provided monitoring for Hall. Second, we note that a court should refrain from referencing the power of the state, particularly that of the Department of Children and Families, in responding to a witness' concern about obtaining childcare while the witness is detained on a material witness warrant. The invocation of the involvement of the Department of Children and Families in response to Wright's childcare concern could have had an unduly coercive effect, and trial courts should avoid making such references whenever possible in order to avoid the appearance of undue coercion.[10] Third, we observe that Hall's testimony apparently was not prioritized, as the trial court accommodated the prosecutor's request to complete the testimony of Lawrence, who was an out-of-state witness, along with that of a state laboratory

_____

[10] We note that the trial court did not mention the Department of Children and Families until *after* it had made the decision to detain Wright overnight. Wright, through counsel, did not inform the trial court that she had a child until after the court had decided to detain her; the court then properly afforded Wright time to determine whether the childcare arrangements that she had in place while she was in court could be extended overnight. Wright's counsel subsequently confirmed with the court that she was able to make arrangements for overnight child care, averting any need to contact the Department of Children and Families.

State *v.* Gray

employee. Although the trial court released Hall later that day with electronic monitoring and direction to return to court after attending his grandmother's funeral; see footnote 9 of this opinion; we emphasize that the trial court should have exercised its "inherent authority to manage trials before it"; *State* v. *Jones*, 314 Conn. 410, 419, 102 A.3d 694 (2014); to minimize the incursion on the liberty of a detained witness by taking all measures necessary to expedite Hall's appearance and testimony during the trial in the first instance.

II

The defendant next argues that the trial court abused its discretion when it admitted into evidence (1) inconsistent statements witnesses previously made during their grand jury testimony for substantive purposes pursuant to *State* v. *Whelan*, supra, 200 Conn. 743, (2) portions of a witness' grand jury testimony that were consistent with her in-court testimony, and (3) the transcripts of grand jury testimony given by two witnesses, when that testimony had been reenacted at trial. Three witnesses, in particular, are the subject of the defendant's claims on appeal: Ameia Cato, Wright, and Lawrence. All three witnesses were present on the day of the shooting and testified at trial to lacking any memory of the shooting or their respective grand jury testimony.

The record reveals the following facts and procedural history relevant to the defendant's *Whelan* claims. During the state's cross-examination of Cato, the state offered a recording of her police interview pursuant to *Whelan*.[11] Defense counsel objected, arguing that the recording should be used only to refresh Cato's recollection, should not be submitted to the jury, and that any consistent portions should be redacted. The trial court concluded that the entirety of the recorded interview

---

[11] We note that the defendant does not challenge the admission of Cato's grand jury testimony under *Whelan*. See footnote 12 of this opinion.

State *v.* Gray

was admissible and that any consistent portions were "needed to place the balance of what's inconsistent with her testimony into context." The recording was played for the jury; defense counsel did not object to providing the jury with a seventeen page transcript of the recording because its audio quality was poor.[12]

Subsequently, Wright and Lawrence similarly testified that they lacked specific memories of the day of the shooting. The state reenacted portions of Wright's grand jury testimony.[13] Defense counsel did not object to the state's reenactment. Counsel objected to certain consistent portions of Wright's testimony being presented, but the trial court concluded that, based on the testimony up to that point, submission of consistent portions was necessary to avoid confusing the jury.

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only [when] there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Tony M.*, 332 Conn. 810, 831, 213 A.3d 1128 (2019).

---

[12] We note that the defendant argues that his *Whelan* claims also apply to the admission into evidence of a transcript of Cato's recorded interview with the police. We need not, however, address the defendant's *Whelan* claims with respect to Cato, insofar as he concedes that the admission of that transcript was harmless error because she did not claim therein that he had the gun.

[13] In order to reenact the testimony, the prosecutor read the questions from the grand jury proceeding, and the court clerk responded with the transcribed answers provided by Wright and Lawrence, respectively, during that proceeding. The trial court explained the process to the jury prior to each reenactment.

State *v.* Gray

## A

The defendant first argues that the trial court abused its discretion when it admitted the prior grand jury testimony of Lawrence and Wright for substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 743. In response, the state contends, inter alia, that this claim was not properly preserved for appellate review. We agree with the state and conclude that this claim was not preserved at trial.

In *Whelan*, "we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified [at] § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided." (Internal quotation marks omitted.) *State* v. *Bennett*, 324 Conn. 744, 768–69, 155 A.3d 188 (2017). "In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made." (Citations omitted; internal quotation marks omitted.) *State* v. *Whelan*, supra, 200 Conn. 748–49 n.4. "Inconsistencies may be shown not only by contradictory statements but also by omissions." Id., 748 n.4.

It is well established that this court "is not bound to consider claims of law not made at the trial" and that, "[i]n order to preserve an evidentiary ruling for review, trial counsel must object properly." (Internal quotation

State *v.* Gray

marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201,
211, 202 A.3d 350 (2019). "Once counsel states the
authority and ground of [the] objection, any appeal will
be limited to the ground asserted. . . . We have empha-
sized that [t]hese requirements are not simply formali-
ties. They serve to alert the trial court to potential error
while there is still time for the court to act. . . .
Assigning error to a court's evidentiary rulings on the
basis of objections never raised at trial unfairly subjects
the court and the opposing party to trial by ambush."
(Citations omitted; internal quotation marks omitted.)
Id., 211–12.

We are unable to reach the merits of the defendant's
claim on appeal because, as the state argues, the defen-
dant does not rely on the grounds defense counsel
raised at trial. Instead, the defendant contends, for the
first time on appeal, that we should, as a matter of law,
limit the admission of prior statements in grand jury
testimony to impeachment purposes only because such
statements are not reliable and, therefore, should not
be admitted for their truth. At trial, defense counsel did
not object to the admission of the grand jury testimony
on the ground of reliability, but only on the ground that
the transcripts were cumulative insofar as the prosecu-
tor had already reenacted the testimony for the jury
through witness testimony. Indeed, when the trial court
asked directly whether defense counsel objected to the
prior grand jury testimony under *Whelan*, counsel stated
he had "no legal basis" to do so. Accordingly, we con-
clude that this claim is unpreserved and decline to
review it on appeal.

B

The defendant next argues that the trial court abused
its discretion in admitting consistent portions of Wright's
grand jury testimony and disclosing them to the jury.
The state argues that the defendant did not identify at

State *v.* Gray

trial which portions of Wright's grand jury testimony were consistent with her testimony at trial and, therefore, that he cannot now argue on appeal that admission of those consistent portions was an abuse of discretion. Although we disagree with the state that the record does not indicate which statements from Wright's grand jury testimony were claimed to be consistent, we nevertheless conclude that the trial court did not abuse its discretion in admitting those portions of testimony so as to avoid confusing the jury.

In admitting consistent portions of the grand jury testimony, the trial court specifically relied on *State* v. *Osbourne*, 162 Conn. App. 364, 131 A.3d 277 (2016), which provides: "In general, the court should seek to avoid admitting evidence that is likely to confuse or mislead the jury. . . . The principle of affording the fact finder the proper context in which to consider statements is codified [at] Connecticut Code of Evidence § 1-5 (a), which provides that [w]hen a statement is introduced by a party, the court may, and upon request shall, require the proponent at that time to introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered contemporaneously with it. This type of determination is largely dependent on the unique circumstances in each case and, as with evidentiary issues in general, is best left to the sound discretion of the trial court." (Internal quotation marks omitted.) Id., 381.

In the present case, the state sought to introduce the transcript of Wright's grand jury testimony. Defense counsel objected to the admission of certain portions of the transcript, arguing that, because Wright eventually remembered identifying certain photographs during her grand jury testimony, those portions of her testimony at trial were consistent with her grand jury testimony

State *v.* Gray

and were inadmissible under *Whelan*. The state
responded that it was necessary to admit those portions
so that the remaining testimony was provided in context
in light of Wright's repeated recollection issues. The
trial court considered Wright's testimony and con-
cluded that, "given the entire nature of [Wright's] direct
examination yesterday, her direct examination . . .
today . . . or the whole impression and effect of what
she said yesterday, the court must examine that in order
to make sure that it is not confusing or misleading to
the jury to then parse it line by line in connection with
the specific objection [the defense is] imposing here
. . . ." Given the court's consideration of the nature of
the testimony and its implications to the jury, along
with the need to provide the requisite context for the
inconsistent statements admitted pursuant to *Whelan*,
we conclude that the trial court did not abuse its discre-
tion in admitting the consistent portions of the grand
jury testimony.

C

Finally, the defendant argues that the trial court
abused its discretion in admitting the transcripts of the
grand jury testimony of Wright and Lawrence because
the reenactment of that same testimony in court ren-
dered the evidence cumulative. After reenacting the
grand jury testimony of both Wright and Lawrence; see
footnote 13 of this opinion; the state offered the grand
jury transcripts as full exhibits under *Whelan*. The
defendant objected, citing *State* v. *Correia*, 33 Conn.
App. 457, 636 A.2d 860, cert. denied, 229 Conn. 911, 642
A.2d 1208, cert. denied, 513 U.S. 898, 115 S. Ct. 253, 130
L. Ed. 2d 174 (1994), in support of the argument that
the admission of the transcripts was cumulative after
the state's reenactment of the testimony for the jury.
The trial court disagreed and concluded that, because
the state could have offered the transcript as a full
exhibit under *Whelan* and could have then sought per-

State *v.* Gray

mission to read from it, doing so in reverse order did not render the admission of the transcripts cumulative.

"When a witness admits making [a] statement, additional documentary evidence of inconsistency might be deemed to have been merely cumulative." (Internal quotation marks omitted.) Id., 463, citing *State* v. *McDowell*, 179 Conn. 121, 127, 425 A.2d 935 (1979). "Evidence is cumulative if it multiplies witnesses or documentary matter to any one or more facts that were the subject of previous proof. . . . The court's power in that area is discretionary. . . . In precluding evidence solely because it is cumulative, however, the court should exercise care to avoid precluding evidence merely because of an overlap with the evidence previously admitted." (Internal quotation marks omitted.) *State* v. *Porfil*, 191 Conn. App. 494, 531, 215 A.3d 161 (2019), appeal dismissed, 338 Conn. 792, 259 A.3d 1127 (2021); cf. *State* v. *Correia*, supra, 33 Conn. App. 463 (The trial court did not abuse its discretion in declining to admit the victim's written statement to the police as a full exhibit under *Whelan* because the victim had admitted to making the statement, defense counsel had read it "to the jury several times and the trial court also permitted defense counsel to argue the statement's truth to the jury. Therefore, the portions of the statement that the defendant claimed consisted of prior inconsistent statements were before the jury and the witness' credibility had been called into question.").

Considering the testimony of Wright and Lawrence in its entirety, we conclude that the trial court did not abuse its discretion in admitting the transcripts into evidence following their reenactment. First, in contrast to *Correia*, on which the defendant relies, neither Lawrence nor Wright admitted the substance of their prior statements before the grand jury, claiming that they did not recall testifying about much of the *Whelan* material. Second, as the trial court observed, the transcripts

State *v.* Gray

could have been admitted into evidence first and subsequently read aloud. Finally, the jury would have been free to request playback of the relevant testimony at any time during deliberations, meaning that providing the transcripts among other exhibits does not emphasize or increase their availability to the jury. See, e.g., *State* v. *Martinez*, 171 Conn. App. 702, 743–44, 158 A.3d 373, cert. denied, 325 Conn. 925, 160 A.3d 1068 (2017); see also Practice Book § 42-26. The trial court, therefore, did not abuse its discretion by admitting into evidence as full exhibits the transcripts of the grand jury testimony of Wright and Lawrence.

The judgment is affirmed.

In this opinion McDONALD, D'AURIA, KAHN, ECKER and KELLER, Js.,concurred.

MULLINS, J., concurring in the judgment. I agree with and join part II of the majority opinion. I also agree with the majority's conclusion in part I of its opinion that the defendant's unpreserved claim that the trial court violated the defendant's due process rights by admitting coerced and involuntary testimony in the state's favor fails under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). I write separately, however, because I respectfully disagree with the majority's analysis in part I of its opinion insofar as the majority concludes that the defendant's claim fails under the third prong of *Golding*. Instead, I would conclude that the defendant's claim fails under the first prong of *Golding* because the record is inadequate for review. Accordingly, I concur in the judgment.